GRUVER-COOLEY JADE CORPORATION,
ET AL. *v.* PERLIS, ET AL.

[No. 300, September Term, 1968.]

*Decided March 12, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*Robert H. Metz*, with whom were *Linowes & Blocher* and *R. Robert Linowes* on the brief, for appellants Elsie E. Marks, Martha F. Riess and Gruver-Cooley Jade Corporation.

*Harry W. Lerch*, with whom was *Sanford E. Wool* on the brief, for appellant Maryland-National Capital Park and Planning Commission.

Submitted on brief by *David L. Cahoon, County Attorney, Alfred H. Carter, Deputy County Attorney*, and *Stanley D. Abrams, Assistant County Attorney*, for appellant Erwin W. Bucklin.

Amicus curiae brief filed by Suburban Maryland Homebuilders Association. *I. John Ritterpusch, Lawrence E. Speelman* and *Ritterpusch & Gingell* on the brief.

*Samuel Gordon*, with whom was *Marvin E. Perlis* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

The trial judge, Shure, J., declared the plat of "Blocks Q and R" of Luxmanor "to have been illegally approved" by the Montgomery County Planning Board[1] (board) and, consequently, to be null and void. At the core of the dispute is the question whether the word "board" as used in the applicable section of the Montgomery County Zoning Ordinance means the *Montgomery County Planning Board* or the *Montgomery County Board of Appeals*. The appellants are The Maryland-National Capital Park and Planning Commission (Commis-

---

1. The Maryland-National Capital Park and Planning Commission, Montgomery County Planning Board.

sion), Erwin W. Bucklin, Director of Inspection and Licenses of Montgomery County (Bucklin), Elsie E. Marks and Martha F. Riess (Marks-Riess), the owners of Luxmanor, and Gruver-Cooley Jade Corporation (Gruver-Cooley), the developer of Luxmanor under a contract with Marks-Riess. The appellees Marvin E. and Edith Perlis (Perlis) own a lot adjoining Block R; the appellees Robert V. and Kathleen O. Smith (Smith) own a lot adjoining Block Q.

Marks-Riess engaged Gruver-Cooley to develop their R-R (Rural Residential) land, a few miles south of Rockville, into a single family subdivision under the density control provisions of § 111-7 (g) of the Montgomery County Code (1965) which is as follows:

> *"Density control development:*
>
> "(1) PURPOSES. The purposes of this subsection and other sections of this chapter concerning average lot size are to provide a method of development for land to pemit variation in lot sizes without an increase in the density population or development, to encourage subdivisions with varying lot sizes so as to allow home buyers a choice of lot sizes according to their needs, to preserve open space, tree cover, recreation areas, scenic vistas, outstanding natural topography and to prevent soil erosion by permitting varying lot sizes according to the nature of the terrain within the development.
>
> "(2) PUBLIC WATER AND SEWER. The provisions of this subsection shall not be applicable nor shall land be subdivided under the herein permitted variations from the R-R minimum standards unless both public water and public sewer will be available prior to occupancy of building lots. When land is subdivided under this subsection, no building permit shall be issued unless such water and sewer are available.
>
> "(3) VARIATIONS PERMITTED. All requirements of the R-R zone shall apply to a density control development, except as specifically modified as follows:
>
> "a. NET LOT AREA. Each main building to-

gether with its accessory buildings may be located on a lot having a net area of at least fifteen thousand square feet; provided, that the average net area of all lots created by any subdivision in which such lot is located shall be at least twenty thousand square feet.

"b. YARDS, REAR. Accessory buildings may be located not less than sixty feet from the front lot line or proposed front street line.

"(4) LOT AVERAGES, SPECIAL REQUIRE-MENTS:

"a. To control what may be included on a plat for the purposes of the average net lot area requirement, the county planning board, at its discretion, may exclude from such average any lots which by reason of size, shape or location, or for other good cause, are not reasonably suitable for single-family residential development, or the board may require replatting of such lots. The board may also require that lots adjoining major highways, limited access highways, railways, multi-family, commercial or industrial zoning be at least twenty thousand square feet in net lot area.

"b. Land within such subdivision not platted into building lots may be counted in the average net lot area when such land is dedicated to public use for recreation, parks, school sites or other public purpose, and such dedication has been approved by the board on the recorded subdivision plat. Areas dedicated for state, county or municipal public roads, streets, sidewalks, crosswalks, utility and storm drainage rights of way, and for location of other necessary facilities appurtenant thereto shall not be included in the average.

"c. An accumulation of excess area from one subdivision to another may be transferred to an adjoining subdivision only upon approval of the board. The average net area of all of the lots in any record plat, together with all record plats previously recorded in the same subdivision, shall be not less than twenty thousand square feet.

"d. Record plats filed under this provision shall con-

tain a notice thereon of 'R-R Density Control Development—Resubdivision Strictly Controlled.' Resubdivision of a density control plat which would reduce average net lot area is prohibited, except for any part which may later be rezoned under the provisions of this chapter to a different zone."

In June 1961 Gruver-Cooley filed with the Commission a preliminary subdivision plan of Luxmanor showing 86 lots with an average density of 20,685 square feet per lot. Montgomery County Code (1965) § 104-23 et seq. The board approved the preliminary subdivision plan on 23 August 1961. Implementing the preliminary plan Gruver-Cooley prepared and filed two record plats, both of which were approved by the board on 10 January 1962. The first, entitled "Blocks G, H and J and Parts of Blocks D, E and K," contained 43 lots totaling 895,978 square feet, averaging 20,837 square feet per lot. Since the average area had to be only 20,000 square feet per lot there was a surplus of 35,978 square feet. The second, entitled "Blocks E and K and Parts of J and D," contained 35 lots totaling 707,479 square feet, averaging 20,214 square feet per lot, leaving a surplus of 7,479 square feet. Both plats were filed, approved and recorded among the Land Records, in accordance with the density control provisions set forth above.

By mid-1964 Gruver-Cooley was ready to proceed with the preparation of a record plat for the remainder of the land shown on the preliminary plan approved in August 1961. A revised preliminary plan,[2] filed in January 1965, was approved by the board on 4 May 1965. The implementing record plat was approved by the board in December 1965 and recorded among the Land Records in April 1966. According to the preliminary plan filed in June 1961 the remainder of the property was to be divided

---

2. Montgomery County Code (1965) § 104-24 (g) is as follows:
  *"Time limit on approval.* If within one year from the date of approval of a preliminary plan, the subdivider has not placed on final plats all of the area covered by such approved preliminary plan, then the approval for the remainder of the plan shall expire. The subdivider may apply for an extension of the approval of a preliminary plan, subject to the same limitations as above."

into 12 lots averaging 21,247 square feet per lot. The record plat approved in December 1965 showed the same number of lots but the average number of square feet per lot was reduced to 17,450 square feet. It appears that 32,070 square feet had been dedicated to the newly proposed Rosemont Drive and 8,243 square feet to the improvement of the intersection of Lux Lane and Tuckerman Drive. The visible effect of the change on Perlis seems to have been that under the 1961 preliminary plan his land was abutted by two lots whereas the record plat shows him to be bordered by four smaller lots. In Smith's case six lots now abut his property whereas under the preliminary plan there were only four.

The record plat of "Blocks Q and R" shows a deficit of 30,596 square feet but it will be recalled the first two plats showed a surplus of 43,457 (7,479 + 35,978) square feet so that for the entire subdivision there was actually a surplus of 12,861 square feet.

In March 1968, almost two years after the record plat of "Blocks R and Q" had been recorded among the Land Records, Perlis and Smith filed their bill of complaint alleging the impropriety of transferring excess area from one subdivision to an adjoining subdivision, lack of notice and irreparable damage and praying temporary and permanent injunctive relief. At trial an allegation in respect of the requirement of notice was withdrawn.

Judge Shure seems to have taken the position that excess area may not be transferred from one subdivision to an adjoining subdivision and that even if it is permissible approval of the Board of Appeals is required. In his opinion, he said:

> "The clear intent of this density control requirement is to insure that the average net area of all lots on any recorded plat shall be not less than 20,000 square feet. If accumulation of excess area is to be transferred to any adjoining subdivision, *this may be done only upon approval of the County Board of Appeals.* (Sec. 111-7) No such approval was granted, or even sought in this case. The builder-owners here elected to proceed with the development of the entire

Luxmanor area on a piecemeal basis and by the establishment of three subdivisions. This was to accommodate their personal development plans and *they cannot borrow from one subdivision to accommodate another to the aggrievement of those who have lots of sufficient density and will be drastically affected, as are the plaintiffs herein."* (Emphasis added.)

## I.

Although Perlis and Smith seem not to have argued the point below, in this Court they make much of Judge Shure's statement that approval of the transfer of excess area from one subdivision to another may be given only by the Montgomery County Board of Appeals. Perhaps, in limine, it ought to be noted that in the Montgomery County Code, the word "board" has at least four definitions. In § 83-22 it is defined to mean the "electrical board;" according to § 104-1 it means the "Montgomery County Planning Board" (of the Maryland-National Capital Park and Planning Commission) ; § 111-2 declares it to mean the "county board of appeals;" it may also mean the "Board of License Commissioners," Appendix E, p. 2267. It is true, of course, as Perlis and Smith are quick to point out, that § 111-7 is a part of Chapter 111, titled "Zoning," that § 111-2 "Definitions" provides that "[f]or the purposes of this Chapter [111] the following words and phrases shall have the meanings respectively ascribed to them by this section," and that the word "Board" is defined to mean the "county board of appeals." If, as they argue, the definition in § 111-2 must be applied to § 111-7 (g) and if, as it would seem to follow, the County Council intended the word "board" to mean the "county board of appeals" it is very odd indeed that the Council should have used, in § 111-7 (g) (4) a, the words "the county planning board" when the word "board" would have sufficed. It seems to us that the choice of words was deliberate and intentional. It will be recalled that although § 111-7 (c) (1) establishes a minimum area of 20,000 square feet for *each* lot in an R-R zone the stated purpose of the density control section, 111-7 (g), is to provide a method of development permitting variation in lot sizes so as "to encourage *subdivisions* with varying

lot sizes." (Emphasis added.) To this end the minimum area per lot is reduced to 15,000 square feet, provided, however, that the average net area of all of the lots "shall be at least 20,000 square feet." It is at once apparent that § 111-7 (g) has to do with *subdivision,* not zoning, and to what more appropriate body ought the administration of the provisions of that section be committed than to the "county planning board," already defined, already in existence and already charged with the administration of subdivision control by Chapter 104 of the Montgomery County Code, titled "Subdivision of Land."

Since we are of the firm opinion that the County Council used the expression "the county planning board" intentionally, deliberately and for the purpose of excluding "the county board of appeals," it would certainly seem to follow that the subsequent use, in § 111-7, of the word "board" was intended to mean the "county planning board." It will be observed that later in the very same sentence in which the words "the county planning board" are first used the word "board" also appears. Parsed, in part, the sentence reads "the county planning board * * * may exclude * * * or the board may require." It would be folly indeed to insist that the word "board," the subject of the disjunctive clause, means the "county board of appeals." In the succeeding sentence the words "[t]he board may also require" unmistakably refer back to and provide a nexus with the preceding sentence. Here again it would be frivolous to suggest that what might be required in this regard is a function of the "board of appeals." The next use of the word "board" has to do with the same subject matter and a function which normally is exercised exclusively by the planning board. It is entirely clear to us that what is contained in § 111-7 (g) (4) c is germane to everything else in § 111-7 (g) ; in fact, standing alone subsection (4) c would be virtually meaningless. That "approval of the board" means the approval of the county planning board seems to us to be inescapable.

We find further support for the opinion expressed above in other sections of Chapter 111. Sec. 111-17 (d) (3) provides, in part, as follows :

  "(3) REPORT BY PLANNING BOARD. If *the planning board* finds that a proposed site * * *. *The*

*board* shall notify the applicant and the district council * * *." (Emphasis added.)

In § 111-25 (e) (3) we find the following:

"(3) REVIEW AND REPORT BY PLANNING BOARD. *The planning board* shall examine the proposed town sector plan * * *. If *the board* finds that the proposed town sector plan * * *. *The board* shall notify the district council * * *." (Emphasis added.)

*See also* §§ 111-25 (g) (2) and 111-25 (h). Another instance appears in § 111-26 (d) (3):

"(3) REVIEW AND REPORT BY PLANNING BOARD. The *planning board* shall examine the proposed planned neighborhood plan * * *. If *the board* finds * * *. *The board* shall notify the district council * * *." (Emphasis added.)

*See also* § 111-26 (e) (1), (2) and (3).

The powers and duties of the county board of appeals are stated in § 111-30. Our close scrutiny of this section has not revealed anything which could be said to require a transfer of excess area to be approved by the board of appeals rather than the planning board.

· The repetition here of the familiar and oft-quoted principles of statutory construction would be to no purpose. However, what was said in *Maguire v. State,* 192 Md. 615, 623, 65 A. 2d 299 (1949), seems apposite:

"Adherence to the meaning of words does not require or permit isolation of words from their context. '* * * the meaning of the plainest words in a statute may be controlled by the context. A statute should be so construed that all its parts harmonize with each other and render them consistent with its general object and scope.' *Pittman v. Housing Authority,* 180 Md. 457, 463-464, 25 A. 2d 466, 469. '* * * it is the most natural and general exposition of a statute to construe one part of the statute by another part of the same

statute, for that best expresseth the meaning of the makers.' *Coke upon Littleton,* p. 381a. 'If it be true that it is the duty of the court to ascertain the meaning of the legislature from the words used in the statute and the subject-matter to which it relates, there is an equal duty to restrict the meaning of general words, whenever it is found necessary to do so, in order to carry out the legislative intention.' *Reiche v. Smythe,* 13 Wall. 162, 164, 20 L. Ed. 566."

## II.

Perlis and Smith appear to be arguing that even if the ordinance intended approval by the planning board rather than the board of appeals, § 111-7 (g) (4) c still requires the "average net area of all of the lots in any record plat, together with all record plats previously recorded *in the same subdivision*" (emphasis by appellees), to be not less than 20,000 square feet. They point to the cross-examination of John J. Broda, one of the Commission's planning engineers, in which he admitted that the record plat of "Blocks Q and R" was a "subdivision plat" and that it is a "subdivision." Therefore, they continue, since "Blocks Q and R" are a subdivision, and since no other record plats have been recorded in that same subdivision, the plat is illegal because the net average of all of the lots is less than 20,000 square feet. So now the question is what does the word "subdivision" mean as used here. In § 70-67 of the Montgomery County Code (Laws of Maryland of 1959, Ch. 780, sec. 1 at 1250),

"[t]he word 'subdivision' means the division of a lot, tract, or parcel of land into two or more lots, plots, sites, tracts, parcels or other divisions for the purpose, whether immediate or future, of sale or building development, *and includes resubdivision* and, when appropriate to the context, relates to the process of subdividing or to the land or area subdivided; * * *." (Emphasis added.)

The definition is repeated in § 104-1. There is, to be sure, a measure of confusion arising out of the first sentence of § 111-7 (g) (4) c when it is considered out of context. The confusion

694

vanishes, however, if one inserts the words "record plat of the" before "subdivision" so that the sentence will read "[a]n accumulation of excess area from one [record plat of the] subdivision to another may be transferred to an adjoining [record plat of the] subdivision only upon approval of the board." Any doubt that this is what the Council meant cannot fail to be resolved by a comprehensive look at the mechanism provided by the ordinance for the creation and implementation of residential subdivisions.

Sec. 104-12 (a) provides as follows:

"(a) *Phases.* In order to provide an orderly basis for the processing of subdivision plans prior to approval, the board will consider such plans in *two stages,* as follows:

"(1) The *preliminary plan* shall be submitted with application and fee for conditional or tentative approval.

"(2) The final plat for recordation of *all or part of a subdivision* shall be submitted with required supporting data and documents, together with application for approval and plat feet." (Emphasis added.)

Sec. 104-23 (a) requires that every "proposed subdivision or *resubdivision* shall be submitted to the board for tentative or conditional approval in the form of a *preliminary plan* prior to the submission of a *subdivision record plat.*" (Emphasis added.)

Sec. 104-24 (g) provides that "if within one year from the date of approval of a preliminary plan, the subdivider has not placed on final *plats* all of the area covered by such approved preliminary plan, then the approval for the remainder of the plan shall expire." (Emphasis added.)

Sec. 104-25 (a) states that "a final plat may include only a portion of the approved preliminary plan; * * *."

Finally, and perhaps conclusively, the second (and last) sentence of § 111-7 (g) (4) c provides that "[t]he average net area of all of the lots in any record plat" which, of course, is precisely what the plat of "Blocks Q and R" is, "together with all record plats previously recorded in the same subdivision," Luxmanor, "shall be not less than" 20,000 square feet. This seems to us to be a clear indication that the plat of "Blocks Q

and R" is not to be considered as standing alone and that in calculating the average net area of the 12 lots contained therein there must be added the area of the two plats previously recorded. If that is done the average net area exceeds 20,000 square feet per lot.

The last shot in appellees' locker is aimed at the expression "adjoining subdivision." It is argued that because "Blocks Q and R" are separated from "Blocks G, H and J and parts of Blocks D, E and K" by Tuckerman Lane (80 feet wide) they are not "adjoining," and since a transfer of excess area can be made only from one subdivision to an "adjoining subdivision" the attempted transfer in the case at bar must fail. We are not impressed by this argument.

The term "adjoining" has been defined as follows:

> "In its etymological sense, and according to the more approved definitions, the word means abutting, contiguous, having a common boundary, in contact with, lying next to or in contact with, meeting at some line or point of juncture, next to, touching, touching or contiguous, as distinguished from lying near or adjacent; but this is not necessarily the meaning of the word in all connections, and the word may be employed as meaning adjacent, close or near to, or nearest or most accessible. The meaning of the word as employed in a particular case must be gathered from the context, the intention, and the particular circumstances under which it is used." 2 C.J.S. *Adjoin* at pp. 1-2 (1936).

"Adjoining premises" has been defined as follows:

> *"Adjoining premises.* \* \* \* the term has also been construed as not absolutely precluding the idea of separation by some object intervening ['Adjoining' may not require properties to touch but merely to be separated by no other property which can be put to private use, citing *Homac Corp. v. Sun Oil Co.,* 244 N.Y.S. 51, 54, 137 Misc. 551; a yard may be separated by a street and yet adjoin, citing *Commonwealth*

*v. Curley,* 101 Mass. 24, 25.] and the question as to what amount of separation will or will not deprive premises of the character of adjoining premises within the meaning of that term depends upon the circumstances of each particular case." *Id.* at 2.

In any case, it is plain that the council had in mind the adjunction of record plats of parts of a subdivision and not separate subdivisions. The entire subdivision must be shown on the plat of the preliminary plan. The development of the entire subdivision may be accomplished on a piecemeal basis by the use of record plats which when all added together will comprise the entire subdivision as shown on the preliminary plan. Since the ordinance contemplates the transfer of excess area from one record plat to another record plat it would seem to matter little that a matching line might happen to be on one or the other side of one of the streets in the development.

The views expressed herein make it necessary for us to reverse the decree of the learned trial judge.

*Decree reversed.*
*Costs to be paid by appellees.*