821 A.2d 40

DIMENSIONS HEALTH CORPORATION, et al.

v.

MARYLAND INSURANCE ADMINISTRATION, et al.

No. 86, Sept.Term, 2002.

Court of Appeals of Maryland.

April 7, 2003.

**2**

Diane Festino Schmitt (Howard L. Sollins of Ober, Kaler, Grimes & Shriver); Willie W. Williams (Thomas C. Dame of Gallagher, Evelius & Jones, LLP, on brief), Baltimore, for appellants.

Randolph Stuart Sergent, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, and Kathleen A. Birrane and Aretha J. Ector, Assistant Attorneys General on brief), Baltimore; Thomas S. Gigot (Michael J.

Prame, Robert P. Gallagher of Groom Law Group, on brief), Washington, DC, for appellees.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

Appellants, Dimensions Health Corporation (DHC) and Mercy Medical Center, Inc. (Mercy), challenge a final order of the Maryland Insurance Commissioner which declared that United HealthCare of the Mid–Atlantic, Inc. (United), a health maintenance organization, was not required to reimburse appellants for certain hospital services they rendered to United members. The Circuit Court for Baltimore City affirmed the Commissioner's order. We agree with that result.

## BACKGROUND

Appellants' complaint hinges on the construction of two provisions in the law regulating health maintenance organizations—Maryland Code, §§ 19–712(b) and 19–713.2 of the Health–General Article (HG). Those statutes have meaning, however, only when one first understands some of the relationships that exist (or at least that once existed) in a managed health care system.

United is a health maintenance organization (HMO), which is a term defined in HG § 19–701(f). For our purposes, it is an organization that agrees to provide certain hospital and medical services for its members in return for predetermined capitation payments made on a periodic basis by or on behalf of the members. An HMO may carry out its obligation to provide the hospital and medical services in three ways: (1) with respect to physician services, it may provide the services directly, through employees or partners of the HMO (HG § 19–701(f)(5)); (2) it may contract with hospitals and physicians or physician groups to provide the services; or (3) under HG §§ 19–712(b) and 19–713.2, it may contract with an Administrative Service Provider (ASP) for the ASP to provide, either directly or through "external providers," the services

for which, as between the HMO and its members, the HMO is responsible.

In the case before us, United chose the third method. In September, 1996, it entered into an ASP contract with Dimensions Health Network (DHN) for DHN to provide, or arrange for the provision of, hospital and medical services to United's members who were within a designated service area and who selected DHN as their provider. Under that agreement, United agreed to pay to DHN a monthly capitation payment for each such United member, in return for which DHN agreed to provide, or arrange for the provision of, the agreed-upon hospital and medical services. The DHN service area was centered in Prince George's County. In April, 1997, United entered into a similar ASP contract with Maryland Personal Physicians, Inc. (MPPI) for the provision of services within the MPPI service area. The MPPI service area was centered in Baltimore.

DHN was a non-profit, non-stock membership corporation. It had two classes of members. The one Class B member was DHC, which owns and operates three hospitals in Prince George's County. The Class A members consisted of certain physicians who, among other things, were either on the medical staff of a DHC facility or had a practice that did not mandate such membership, and who had entered into an agreement with DHN to become a participating provider. It was anticipated that most of the services to be provided by DHN under the contract would be provided by its Class A or Class B members—that is, the participating physicians who were the Class A members and the hospitals owned and operated by DHC.

MPPI is a Maryland stock corporation. Its majority (57%) stockholder is Mercy. MPPI and Mercy each had a complex set of ownership and contractual relationships with various physician groups and other health care providers that the Insurance Commissioner regarded as "affiliates" of Mercy. It was anticipated that the hospital services would be provided by Mercy in Baltimore.

An ASP obviously acts as an intermediary between the HMO and its members, as well as between the HMO and the doctors and hospitals who actually provide the medical and hospital services to the HMO's members. Absent an ASP, the relationship in an HMO situation is a tripartite, and essentially triangular, one: the members pay a capitation fee to the HMO to assure the provision and cover the cost of the agreed-upon range of hospital and medical services; the HMO employs or contracts with doctors and hospitals (and other direct health care providers) to provide those services; the doctors and hospitals provide the service to the HMO members and are paid by the HMO. *See Riemer v. Columbia Medical,* 358 Md. 222, 230–31, 747 A.2d 677, 681–82 (2000).

A principal function of an ASP, in an economic sense, is to "downstream" some of the HMO's risk. In return for a capitation payment by the HMO, the ASP assumes responsibility for procuring and paying the hospitals, doctors, and other health care providers who actually provide the medical services that the HMO is obliged to provide for its members. The insertion of an ASP intermediary thus required some refinement or redefinition of the statuses of the HMO and the direct health care providers *vis a vis* each other. Under an ASP arrangement, the HMO and the ultimate providers, who otherwise would look to each other for the provision of the service, on the one hand, and payment for the services provided, on the other, each look to the ASP for both. That insertion, which is of relatively recent origin, also raised some legislative concerns regarding the assurances that (1) the services called for in the HMO-member agreement would, in fact, be provided, and (2) the direct providers of the service would be paid.

Until 1991, Maryland law did not formally recognize ASPs or ASP contracts, although they apparently existed. In that year, House Bill 1263 was introduced to deal with a much narrower issue—the situation in which an HMO had a contract with a health care provider who, because of the provider's inability to render a particular covered service, referred an HMO member to another provider who was able to perform

the service but who had no contractual relationship with the HMO. Some HMOs had taken the position that the capitation payment they made to their contractual providers covered that service and that the HMO had no additional obligation to pay any other provider, with whom it had no contract—that payment for the referred service was the responsibility of the contractual provider that made the referral. Apparently, contractual providers saw the matter differently, and the persons who, on referral, actually provided the service were caught in the middle.

The purpose of HB 1263, as introduced, was to make clear that the HMO was responsible for paying the provider who rendered the service, even though it had no direct contract with that provider. The bill sought to achieve that end by adding language to § 19–712 to provide that an HMO that entered into a contract with another entity for the provision of health care services to the HMO's members had to pay claims for health care services covered by the HMO contract that were rendered by a non-contractual provider pursuant to a referral from the contractual provider.

At its core, the issue addressed by the bill was the responsibility of HMOs to providers with whom the HMO had no direct contractual relationship. That same issue was inherent, though more complex and substantially broader in scope, when the direct contract for all, or at least a broad range of, services was with an ASP, which, in turn, contracted with the actual providers for the provision of all (or at least most) of those services. In that situation as well, the HMO would have no direct contractual relationship with the actual providers of the hospital and medical service,[1] and, in the House Economic

---

1. An ASP arrangement raised the prospect of a double non-contractual referral. The providers under contract with the ASP would still have no contract with the HMO. The possibility existed, however, of even those providers being unable to treat a particular HMO member. It is unclear whether, under the arrangement between the ASP and its providers, the ASP would then undertake to make the referral to another provider or the provider under contract could make the referral. In the latter situation, the ultimate provider would not be under

Matters Committee, the bill was substantially amended to deal with that broader issue. This was done through the enactment of a new § 19–713.2 and a new subsection (b) to § 19–712.[2]

Section 19–713.2(a) defined an ASP contract as a contract or capitation agreement, between an HMO and a "contracting provider," in which (1) the contracting provider accepts payments from the HMO for health care services to be provided to members of the HMO that the contracting provider arranges to be provided by "external providers," and (2) the contracting provider administers payments to the external providers for the services they perform. A "contracting provider" was defined as a health care provider who enters into an ASP contract with an HMO, and an "external provider" was defined as a health care provider who is not (1) a contracting provider or (2) "an employee, shareholder, or partner of a contracting provider."

The balance of § 19–713.2 set out certain conditions and requirements relating to an ASP contract.[3] Subsection (b) provided that an HMO may not enter into an ASP contract unless it first filed with the Insurance Commissioner a plan that satisfied the conditions in subsection (c) and the Commissioner had not disapproved the plan within 30 days after filing. Subsection (c) imposed five requirements on the plan: (1) that it require the contracting provider to submit to the HMO at least quarterly reports that identify payments made or owed to external providers, in sufficient detail to determine if the

---

contract even with the ASP, and so would be twice removed from the HMO.

**2.** The bill actually enacted a new § 19–713.1, but because another bill dealing with a different matter, HB 916, also enacted a new § 19–713.1 and was signed by the Governor before HB 1263, as 1991 Maryland Laws, chapter 418, the new section enacted in HB 1263 became codified as § 19–713.2.

**3.** In 2000, following the relevant events in this case, § 19–713.2 was substantially amended. *See* 2000 Md. Laws, ch. 323. Because the law in existence prior to these changes governs this case, we shall cite the law as it then appeared.

payments are being made in compliance with law;[4] (2) that it require the contracting provider to submit annually to the HMO a current annual financial statement; (3) that it require either (i) the creation, by or on behalf of the contracting provider, of a segregated fund or (ii) the availability of other resources, sufficient to satisfy the contracting provider's obligations to external providers for services rendered to HMO members; (4) that it require an explanation of how the segregated fund or other resource is sufficient for that purpose; and (5) that it permit the HMO, on reasonable notice, to inspect and audit the contracting provider's books, records, and operations to determine the contracting provider's compliance with the plan.

Section 19–713.2(e) required the HMO to monitor the contracting provider in order to assure compliance with the plan and to notify the contracting provider of any compliance failure. Following any such notice, the HMO was required to assume the administration of any payments due from the contracting provider to external providers.

In new § 19–712(b), the Legislature dealt more directly with the initial thrust of the bill. It provided that an HMO that entered into an ASP contract was responsible for all claims or payments for health care services that were (1) covered under the member's contract, and (2) rendered by "a provider, who is not the person or entity which entered into the [ASP contract with the HMO] pursuant to a referral by a person or entity which entered into the [ASP contract with the HMO]."

The ASP contracts that United entered into with DHN and MPPI were, of course, subject to the 1991 law, and they purported to make provision for its requirements.[5] Section

---

4. A separate bill (HB 416, enacted as 1991 Maryland Laws, chapter 188) enacted a new § 19–712.1 to require that an HMO reimburse any provider, for services rendered to HMO members, within 30 days after receipt of a properly documented claim. HB 1263 took note of HB 416. *See* 1991 Md. Laws, ch. 446, § 3.

5. One departure was in the contractual definition of "external provider." As noted, and as is critical in this case, § 19–713.2 defined the

3.1.7 of both contracts obligated the ASPs, in consideration of the capitation payments made by United, to provide or arrange for the hospital and physician services required under the agreement and to assume responsibility for the cost of those services. Section 3.2 of the DHN contract, referencing § 19–713.2, required DHN to provide United with acceptable collateral to secure an amount equal to the immediately preceding 60 days of capitation, the purpose being "to ensure that sufficient funds are on hand to reimburse HMO for any payment made to External Providers, as required by law, if [the ASP] fails to make any such payments." The parties agreed that a Standby Letter of Credit from a commercial bank would be deemed acceptable collateral. The MPPI contract called for a guaranty by Mercy of an amount equal to two months of capitation payments payable to MPPI.[6] Under § 5.2 of both contracts, DHN and MPPI agreed, in consideration of the capitation payments from United, to arrange and pay for "all those Referral Physician and other health professional services which [United] is required to provide as Covered Services and which are Medical Services."

The weakness in this scheme, which the Legislature attempted to correct in the 2000 legislation, was that ASPs such as DHN and MPPI were not subject to direct regulation by the Insurance Commissioner, who could not, therefore, assure their financial stability through devices such as minimum

---

term as excluding an employee, shareholder, or partner of an ASP. The contracts did not contain that exclusion but rather defined "external provider" as "*any* physician, health professional, or other health care provider, including [DHN or MPPI] Physicians, Health Service Contractors, and Health Centers contracted with [DHN or MPPI] to provide Covered Services to all Members of the HMO." (Emphasis added). Nothing in that definition, or in the definitions of DHN or MPPI "physician[s]," served to exclude employees, shareholders, or partners of DHN or MPPI. It may be that, as a result, the ASP contracts were not in compliance with the law and should not have been formally or tacitly approved, but no one has raised that issue, so it is not before us.

**6.** As noted by the Court of Special Appeals in *Mercy Medical Center, Inc. v. United Healthcare of the Mid–Atlantic, Inc.*, 149 Md.App. 336, 815 A.2d 886 (2003), that guarantee was not forthcoming until April 1, 1998–a year after the agreement went into effect.

capital and surplus requirements or Maryland Insurance Administration financial examinations, or take control of them in the event of insolvency. These largely unregulated ASPs had, however, undertaken very significant financial responsibilities, only part of which, it turned out, was covered by segregated funds or other committed resources. What led to this case was just that problem. In March, 1999, MPPI informed United of its intent to terminate the United contract, and on September 2, 1999, MPPI filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code. Upon the bankruptcy, MPPI failed to pay certain claims for services that were covered under United's contract and were provided by health care providers, including Mercy, with which MPPI had contracted. On November 16, 1999, United was notified of the emergency closing of DHN as of the close of business November 15, which left unpaid claims for covered services provided by health care providers, including DHC, with which DHN had contracted.

DHC and Mercy, along with others, immediately looked to United for payment. DHC was ultimately seeking about $2.5 million for services rendered by its hospitals and the physicians who were Class A members of DHN; Mercy sought about $1.6 million for services rendered by its hospital. United took a number of interim actions but denied liability on DHC's and Mercy's claims.[7] In an order entered on December 27, 1999, the Insurance Commissioner determined that

---

7. Faced with the effective disappearance of DHN and MPPI, United made direct contractual arrangements with physicians in the DHN and MPPI networks to assure a continuation of care for its members. It also attempted to collect and administer the committed funds under the contracts but ran into opposition when (1) competing claims were made against the segregated fund of another ASP that had declared bankruptcy, Doctors Health, Inc. on the ground that it was an asset of the bankruptcy estate, and (2) Mercy refused to honor its guaranty under the MPPI contract. The bankruptcy court ultimately held that a segregated fund was not an asset of the bankruptcy estate (*In re Doctors Health, Inc.*, 238 B.R. 594 (Bankr.D.Md.1999)), and the Circuit Court for Baltimore City awarded judgment against Mercy for $5,108,476 on its guaranty. That judgment was affirmed in January, 2003. *Mercy Medical Center, Inc. v. United Healthcare of the Mid Atlantic, Inc , supra*, 149 Md.App. 336, 815 A.2d 886 (2003).

United was responsible for the payment of claims, regardless of whether sufficient funds had been set aside pursuant to § 19–713.2, and he ordered United to pay "all claims for health care services covered under subscriber contracts and rendered by providers, *except claims of providers who are employees, shareholders, or partners of the administrative service provider contractors.*" (Emphasis added). MPPI claims were to be paid by March 31, 2000; DHN claims were to be paid by April 30, 2000.

United sought a hearing and raised a number of issues, headed by whether the Commissioner had any jurisdiction over the payment of external providers with respect to Medicare, Medicaid, and ERISA-plan patients. So far as we can tell, United did not raise as an issue, at that time, whether, because of their respective relationships with MPPI and DHN, Mercy or DHC qualified as external providers. On April 4 and April 26, 2000, the Commissioner rejected the defenses asserted by United and confirmed his order that United pay for all covered health care services rendered by external providers, except claims of providers who are employees, shareholders, or partners of MPPI or DHN. That exclusion tracked the definition of "external provider" in § 19–713.2(a)(4), and thus assumed that United had no obligation to any provider who was not an "external provider." Probably because United had not raised the issue, however, the order did not address whether Mercy and DHC were to be regarded as within that exception.

Aggrieved, United petitioned for judicial review in the Circuit Court for Baltimore City, and it was apparently there that the issue of Mercy's, DHC's, and certain other providers' status arose. Upon stipulation of the parties, execution of the Commissioner's order was stayed and the case was remanded to him for clarification as to who were the external providers required to be paid under the Commissioner's order.

The Insurance Commissioner held another hearing on remand, at which DHC and Mercy participated. On August 21, 2001, he entered a Final Order in which he concluded that, by

reason of their respective relationships with DHN and MPPI, DHC and Mercy were *not* external providers and that, as a result, United bore no responsibility for covered services provided by them to United members.

DHC contended that, although § 19–713.2(a)(4) excluded a "shareholder" in an ASP from the definition of an external provider, a "member" of a non-profit, non-stock corporation was not a "shareholder" and was therefore not excluded. To a large extent, this defense was based on DHN's status as a non-*profit* corporation, rather than its status as a non-stock corporation. The Dean of the Villanova University Law School, called as an expert witness by DHC, opined that members of non-profit corporations are not the equivalent of members of for-profit corporations, and were therefore not shareholders, because they have no residual claim to either the assets or the income of the corporation. Though acknowledging a "superficial appeal" to that argument, the Commissioner rejected it for two reasons. First, he noted that, under Maryland Code, § 1–101(t) of the Corporations and Associations Article, a "stockholder" is defined as including "a member of a corporation organized without stock," and that the definition made no distinction between for-profit and not-for-profit corporations. Second, he pointed out that the members appointed the directors of DHN, elected the officers, and voted on other important matters affecting the corporation. He observed that, "[t]o find that these providers, who control the operation of DHN, are external providers rather than shareholders in the contracting provider turns the statute on its head."

The issue as to MPPI concerned not the stockholders themselves, such as Mercy, but the various health care affiliates of those stockholders, which United also sought to exclude. The Commissioner rejected that argument and limited the exclusion to the stockholders themselves.

United, DHC, and Mercy each sought judicial review in the Circuit Court for Baltimore City. United raised a number of issues—that its liability extended only to the extent of the

reserves in the segregated fund, that its liability was limited to claims for services provided by out-of-network providers upon referral by a contracting provider, and that, in their various contracts with external providers, DHN and MPPI had waived any statutory right the external providers may have had to payment from United. The court rejected all of those defenses. Mercy and DHC contended that, whether or not they were excluded from the definition of "external provider" under § 19–713.2, they had an independent right to payment under § 19–712(b). That section, they urged, made United responsible for all claims for health care services covered under United's subscriber contract that were rendered by a "provider" who was not the person who entered into the ASP contract. They were, they claimed, "providers" and were therefore entitled to payment regardless of whether they were excluded under § 19–713.2. The court rejected that argument as well, holding that §§ 19–712(b) and 19–713.2 have to be read together, in harmony, and that, in determining who is entitled to payment under § 19–712(b) compliance with § 19–713.2 was unavoidable.

Having rejected all of the complaints, the court affirmed the April 26, 2000 and August 21, 2001 orders. DHC and Mercy appealed. We granted *certiorari* before any proceedings in the Court of Special Appeals and, as noted, shall affirm.

## DISCUSSION

 DHC continues to claim that the Insurance Commissioner erred in equating membership in DHN with being a shareholder and thus concluding that it is not an "external provider" entitled to payment under § 19–713.2. Mercy, never contesting that it was a shareholder of MPPI, does not seek to establish liability under § 19–732.1. Mercy's sole argument, and DHC's major argument, is that §§ 19–712(b) and 19–713.2 create separate obligations for an HMO and that, as "providers" who were not also ASPs, they are entitled to payment under § 19–712(b)—that they do not have to qualify as "external providers," which has relevance only with respect to § 19–713.2.

### Status of DHC as Shareholder

The Model Business Corporation Act, drafted and proposed by the Business Law Section of the American Bar Association and adopted in many States, largely excludes non-profit and non-stock corporations from its ambit. *See* Model Business Corporation Act, Official Comment to § 3.01 at 3–4. In line with that approach, it defines "shareholder," for purposes of the Act, as "the person in whose name *shares* are registered in the records of a corporation or the beneficial owner of *shares* to the extent of the rights granted by a nominee certificate on file with a corporation." *See* Model Business Corporation Act, § 1.40 (emphasis added). That definition focuses on shares of stock and says nothing about members of a non-stock corporation.

Maryland has taken a very different approach. The Corporations and Associations Article of the Maryland Code contains statutes governing both general business corporations and several other types of corporate entities, one of which, provided for in Title 5, subtitle 2, is the non-stock corporation. Three provisions are of particular importance. The first is the definition of "stockholder"—the equivalent of "shareholder"—in § 1–101(t): " 'Stockholder' means a person who is a record holder of shares of stock in a corporation *and includes a member of a corporation organized without stock.*" (Emphasis added). That definition, according to § 1–101(a), applies throughout the Article, "unless the context clearly requires otherwise," and thus applies to the provisions in Title 5, subtitle 2, dealing with non-stock corporations.

Confirming the extension of that definition to members of non-stock corporations are §§ 1–102(a) and 5–201. Section 1–102(a), dealing with the applicability of the Article, states that, "[e]xcept as otherwise expressly provided by statute, the provisions of this article apply to every Maryland corporation and to all their corporate acts." Section 5–201, which applies specifically to non-stock corporations, states that "[t]he provisions of the Maryland General Corporation Law apply to nonstock corporations unless: (1) The context of the provi-

sions clearly requires otherwise; or (2) Specific provisions of this subtitle or other subtitles governing specific classes of corporations provide otherwise."

No provision of any other statute has been cited to us that would make the definition of "stockholder" in § 1–101(t) inapplicable to a non-stock corporation, whether it is for-profit or not-for-profit. Indeed, the equation, at least in a definitional sense, of stockholders and members of non-stock corporations is not new. *See Downing Dev. Corp. v. Brazelton*, 253 Md. 390, 395, 252 A.2d 849, 852 (1969). It is true that the rights and responsibilities that stockholders possess may vary, depending on the type of corporation involved, but that does not make them less of a stockholder. The members of DHN were the owners of the corporation; they appointed the directors and officers and were therefore in ultimate control of the corporation. That they were not entitled to any part of the profits or surplus of the corporation was not because they were other than the equivalent of shareholders, but because DHN was a not-for-profit corporation. We therefore hold that the Class A and Class B members of DHN were "shareholders" within the meaning of § 19–713.2 and, accordingly, could not be considered "external providers" for purposes of that section.

### Liability under § 19–712(b)

Appellees' argument, which the Insurance Commissioner and the Circuit Court found persuasive, is that §§ 19–712(b) and 19–713.2 have to be read together, and that, when they are read in harmony, an HMO's obligation, upon default of an ASP, to providers with which it has no contractual relationship is limited to those providers who qualify under § 19–713.2 as "external providers." They urge that the defined term would have no meaning if that were not the case.

Judicial review of an order of the Insurance Commissioner is provided for in § 2–215 of the Insurance Article, subsection (h) of which directs that the court may affirm the decision, remand it for further proceedings, or reverse or modify it if

"substantial rights of the petitioners may have been preju-
diced because administrative findings, inferences, conclusions,
or decisions . . . are affected by . . . error of law." The issue
before us is purely one of law—the proper interpretation of
§§ 19–712(b) and 19–713.2.

▮ The cardinal rule, of course, is to determine what the
Legislature intended, and, as we have so often said, to do that,
we turn first to the words used by the Legislature, giving
them their ordinary meaning. If the provision, so read, is
clear, "no construction or clarification is needed or permitted,
it being the rule that a plainly worded statute must be
construed without forced or subtle interpretations designed to
extend or limit the scope of its operation." *Tucker v. Fire-
man's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986);
*Giant v. Dept. of Labor,* 356 Md. 180, 189, 738 A.2d 856, 861
(1999); *Caffrey v. Liquor Control,* 370 Md. 272, 292, 805 A.2d
268, 279 (2002).

▮ If there is an ambiguity, however, we need to look at
other aids, one of which is to construe statutes that deal with
the same matter harmoniously, so that all parts can have
meaning. As we said in *Waters v. Pleasant Manor,* 361 Md.
82, 103, 760 A.2d 663, 675 (2000), "[a]scertaining the ordinary
and common meaning of the statute, in turn, requires putting
its language into context, which includes incorporating the
overall purpose of the statute into its interpretation," and that
"the statute should be examined in its entirety and not just as
isolated, independent sections." *Id.* at 104, 760 A.2d at 675.
The court will "look at the larger context, including the
legislative purpose, within which statutory language appears."
*Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992);
*Miles v. State,* 365 Md. 488, 517, 781 A.2d 787, 803 (2001).
When construing a statute intended to be administered by an
administrative agency, courts normally give significant weight
to an agency's interpretation of the statute, although they are
not, of course, bound by that interpretation. *See Adamson v.
Correctional Medical,* 359 Md. 238, 266, 753 A.2d 501, 516

(2000); *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 65, 706 A.2d 1060, 1070 (1998).

Clearly, the overall goal of the Legislature in enacting HB 1263 was to assure that certain classes of health care providers who had no direct contractual relationship with an HMO were nonetheless paid by the HMO for services rendered to HMO members upon referral from providers who *did* have a contractual relationship with the HMO. It is also clear, however, that, in imposing that liability on the HMO in an ASP situation, for what, in essence, would be a double payment—once to the ASP and again, upon default by the ASP of *its* contractual obligation, to the ultimate provider—the Legislature intended to exclude certain providers from that protection. In § 19–713.2, which was the section that attempted most directly to regulate the ASP contract, it used a defined term, "external provider," to define the class of protected providers, and, in so doing, deliberately excluded not only the ASPs themselves, but also their employees, shareholders, and partners.

DHC and Mercy see the language of § 19–712(b) as creating a separate and independent obligation on the part of an HMO to a larger group of providers—a group that would include employees, shareholders, and partners of an ASP—but offer no reason why the Legislature, in the same bill, would want to do such a thing. Why would it so carefully limit the class in § 19–713.2, by using a defined term, if that limitation would have no meaning? Why would it limit payments from the required segregated fund only to external providers and yet provide a general liability to other categories of providers?

We can find no basis for such a disparate interpretation. The segregated fund or other committed resource was intended as a protection for the HMO, to give it a source of funds from which to pay the protected providers in the event the ASP defaulted on its obligation to them. Upon default by the ASP, § 19–731.2(e) provides for the HMO to assume the administration of payments due by the ASP to "external providers" on behalf of the ASP. We do not believe that the

Legislature intended that the providers entitled to payment under § 19–712(b) were to be any other than those entitled to payment from the segregated fund under § 19–713.2.

Apart from the incongruity of construing the statutes as creating two different classes of protected providers, the two provisions can be read harmoniously, as not being inherently inconsistent. For one thing, § 19–712(b) applies only to an HMO that has entered into an ASP contract "as defined in § 19–713.[2]," and that definition, as noted, is limited to an agreement in which the ASP arranges for services to be provided by "external providers"—*i.e.,* persons other than themselves or their employees, shareholders, or partners. In an indirect way, § 19–712(b) has incorporated the "external provider" definition. Moreover, it requires payment only to a provider "who is not the person or entity which entered into the administrative service provider contract with the health maintenance organization. . . ." The effect of the definition of "external provider" is to equate the employees, shareholders, and partners of an ASP with the ASP itself, so that, for purposes of the contingent liability of the HMO in the event of a default by the ASP, they are treated in the same manner as the ASP itself is treated.

This construction recognizes an intent not to require an HMO, which has already paid capitation payments to the ASP, to pay again for services rendered by those who own or operate the defaulting ASP, but rather to protect only the external providers who performed covered services under an arms-length contract with the ASP or on referral by such an external provider. It is the only reasonable way to read the statute. Otherwise, those employees, shareholders, and part-ners would have little incentive to operate the ASP efficiently.[8]

---

8. Some of the complex, corporately incestuous relationships of which MPPI and Mercy were a part are well described in *Mercy Medical Center, Inc. v. United Healthcare of the Mid Atlantic, Inc., supra,* 149 Md.App. 336, 815 A.2d 886. Judge Krauser notes that, not only was MPPI formed and funded by Mercy, but that Mercy's chief executive officer and chief financial officer sat on MPPI's board of directors and its Joint Policy Committee, and that in the negotiations with United that

JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED, WITH COSTS.

led to the ASP contract, MPPI and Mercy were both represented by a third entity created by Mercy, Mercy Ventures, Inc.