832 A.2d 214

**MARYLAND GREEN PARTY, et al.**

**v.**

**MARYLAND BOARD OF ELECTIONS, et al.**

**No. 78, Sept. Term, 2001.**

Court of Appeals of Maryland.

July 29, 2003.

Opinion on Reconsideration Sept. 11, 2003.

134

Frank M. Dunbaugh, Annapolis (Mark Miller, admitted pro hac vice, Greenbelt), all on brief, for appellants.

Michael D. Berman, Deputy Chief of Litigation (J. Joseph Curran, Jr., Atty. Gen. and Judith A. Armold, Asst. Atty. Gen., on brief), Baltimore, for appellees.

James C. Praley (Lessans, Praley & McCormick, P.A., on brief), Glen Burnie, for appellees.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

ELDRIDGE, Judge.

We issued a writ of certiorari in this case to determine the validity of several provisions of the Maryland Election Code which prescribe the manner in which a minor political party nominates its candidates for offices other than United States President and Vice President.

## I.

As this case comes to us on appeal from a grant of the respondents'[1] motion for summary judgment, we shall set forth the facts in the light most favorable to the petitioners.[2] *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728–729 (2001), and cases there cited. Nevertheless, there do not appear to be any disputed factual issues which are material to our decision in this case.

On August 16, 2000, the Green Party qualified as a statutorily-recognized "political party"[3] in Maryland, after satisfying all of the requirements of Article 33, § 4–102.[4] These require-

---

**1.** The respondents include the Maryland State Board of Elections, the Administrator of the State Board of Elections, the Anne Arundel County Board of Elections, and the Election Director of the Anne Arundel County Board of Elections. Hereafter, the respondents will be collectively referred to as "the Board."

**2.** The petitioners, hereafter collectively referred to as "the Green Party," include the Maryland Green Party, David M. Gross (the Green Party's November 2000 candidate for the House of Representatives in Maryland's first congressional district), the candidate's campaign committee, and various Maryland voters and Green Party members.

**3.** Unless otherwise stated, all statutory references are to Maryland Code (1957, 1997 Repl.Vol., 2002 Supp.), Art. 33. We note that this Article has been revised effective January 1, 2003.

Section 1–101(aa) defines "political party" as "an organized group that is qualified as a political party in accordance with Title 4 of this article."

**4.** Section 4–102 provides in pertinent part:

"(a) *Formation.*—Any group of registered voters may form a new political party by:

(1) Filing with the State Board on the prescribed form a petition meeting the requirements of subsection (b) of this section and of Title 6 of this article;

ments included, *inter alia,* submitting a petition supporting the recognition of the Green Party bearing at least 10,000 signatures. See § 4–102(b)(2)(i). Those who signed this party-forming petition were neither required to be affiliated as Green Party members nor obligated to support future Green Party candidates.

The Green Party then sought to nominate David M. Gross as its candidate for the November 2000 election for the United States House of Representatives in Maryland's first congressional district. Although the Election Code sets forth three procedures for a political party to nominate its candidates,[5] the

---

\* \* \*

"(b) *Requirements of petition.—*

\* \* \*

"(2)(i) Appended to the petition shall be papers bearing the signatures of at least 10,000 registered voters who are eligible to vote in the State as of the 1st day of the month in which the petition is submitted.

\* \* \* "

**5.** As the following statutory provisions demonstrate, the three methods for nominating a candidate are by primary, by convention, and by petition. First, § 4–102(f) provides:

"(f) *Nomination of candidates.*—Unless a new political party is required to hold a primary election to nominate its candidates under Title 8 of this article, the new political party may nominate its candidates by:
(1) Petition in accordance with Title 5 of this article; or
(2) If at least 1% of the State's registered voters, as of January 1 in the year of the election, are affiliated with the political party, convention in accordance with rules adopted by the political party."

But Title 8 limits the use of primary elections for "principal political parties" only:

" § 8–202. **Political parties using the primary.**
"(a) *Generally.*—A principal political party . . .
(1) Shall use the primary election to:
(i) Nominate its candidates for public office; \* \* \* "

Section 1–101, in turn, defines a "principal political party" as "the majority party" or "the principal minority party." These definitions are based upon the parties receiving the highest and second highest numbers of votes for Governor at the most recent gubernatorial election. Finally, § 5–701, dealing with the nomination of candidates, requires:

"Nominations for public offices that are filled by elections governed by this article shall be made:

Green Party was limited to nomination via a *second* petition signed by at least 1% of the total number of registered voters in that congressional district. This limitation was essentially the product of two factors: first, the Green Party was not a "principal political party," and, second, less than 1% of Maryland's voters were registered as members of the Green Party.

On August 7, 2000, the Dave Gross for Congress campaign submitted a timely nominating petition containing 4,214 signatures of voters purporting to be registered in Maryland's first congressional district. On August 23, 2000, however, the Board notified the Green Party that Mr. Gross's name would not be included on the general election ballot because the nominating petition requirements had not been satisfied. The Board claimed that it could verify only 3,081 valid signatures, fewer than the 3,411 required by Maryland's 1% nomination petition requirement.[6] A number of reasons were set forth by the Board for subtracting more than 1,100 signatures. Among these reasons, the Board claimed that many signatures were by "inactive" voters.

On September 5, 2000, the Green Party filed a complaint in the Circuit Court for Anne Arundel County alleging that several of Maryland's ballot access restrictions are unconstitutional. The Party sought declaratory and injunctive relief, relying, *inter alia,* on the Civil Rights Act of 1871, 42 U.S.C. § 1983. Specifically, the Green Party asserted that the

---

(1) By party primary, for candidates of a principal political party; or

(2) By petition for:

(i) Candidates of a political party that does not nominate by primary; or

(ii) Candidates not affiliated with any political party."

**6.** Section 5–703(e) articulates the number of signatures required to nominate a candidate:

"(e) *Petition signatures requirements.*—(1) A candidate who seeks nomination by petition may not have the candidate's name placed on the general election ballot unless the candidate files ... petitions signed by not less than 1% of the total number of registered voters who are eligible to vote for the office for which the nomination by petition is sought, except that the petitions shall be signed by at least 250 registered voters who are eligible to vote for the office. * * * "

Board's actions deprived the Green Party, the plaintiff voters, and the plaintiff candidate, of their rights under the First, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution and under various provisions of the Maryland Constitution and the Maryland Declaration of Rights. The Party also argued that such requirements violate international law and treaties of the United States. In addition, the Green Party sought a temporary restraining order and a preliminary injunction against enforcement of Maryland's ballot access restrictions on third-party candidates and an order requiring the Board to place Mr. Gross's name on the ballot for the November 2000 general election.

After a hearing on September 8, 2000, the Circuit Court denied the Green Party's motions for interim relief. The election then proceeded, with this case being placed on the regular docket of the Circuit Court. After filing its answer, the Board then filed a Motion to Dismiss or, in the alternative, for Summary Judgment. The Board argued that the case should be dismissed as moot because the election had already been held. In the alternative, the Board claimed that summary judgment in its favor was appropriate because there were no genuine issues of material fact. The Board argued that, as a matter of law, it was entitled to a declaration that (a) the Board's petition-validation procedures and the Board's actions in refusing to place Mr. Gross' name on the ballot were fully consistent with Maryland's election laws and (b) that the Board's actions were not in violation of any rights granted to the Green Party under Maryland or federal law.

On February 28, 2001, the Circuit Court for Anne Arundel County held that the Green Party's request for declaratory relief was not moot since the issues were " 'capable of repetition, yet evading review,' " quoting *Storer v. Brown*, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714, 727–728 n. 8 (1974). Accordingly, the Circuit Court denied the motion to dismiss. Nevertheless, the Circuit Court entered summary judgment in favor of the Board, declaring that the Green Party "has not shown that Maryland's election laws are unconstitutional pursuant to the United States Constitution, Mary-

land Constitution, or various international treaties...." The Circuit Court stated that, "[s]ince requirements more stringent than Maryland's requirement have been upheld, as a matter of law, Maryland's 1% requirement is constitutional."

The Green Party appealed to the Court of Special Appeals, but this Court issued a writ of certiorari prior to consideration of the case by the intermediate appellate court. *Green Party v. Board of Elections,* 365 Md. 472, 781 A.2d 778 (2001). We shall reverse the Circuit Court's judgment and remand the case to the Circuit Court for the entry of a declaratory judgment in accordance with this opinion.

## II.

Numerous issues under the federal and state constitutions have been debated by the parties both in the Circuit Court and in this Court. We need not and shall not decide any of the issues raised under the federal constitution or federal law. Our holdings in this case, that certain provisions in the Maryland Election Code and practices by the Board are invalid, shall be based entirely upon Article I of the Maryland Constitution and Articles 7 and 24 of the Maryland Declaration of Rights. *See Dua v. Comcast Cable,* 370 Md. 604, 618 n. 6, 805 A.2d 1061, 1069–1070 n. 6 (2002) ("As pointed out in *Frankel v. Board of Regents,* 361 Md. 298, 313–314 n. 3, 761 A.2d 324, 332 n. 3 (2000), by not reaching the federal constitutional issues 'we do not suggest that the result in this case would be any different if the sole issue were whether the [statutes] violated the federal Constitution. 'We simply are making it clear that our decision is based exclusively upon the [Maryland Constitution] and is in no way dependent upon the federal [Constitution]' ). *See Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983); *Perry v. State,* 357 Md. 37, 86 n. 11, 741 A.2d 1162, 1189 n. 11 (1999)."

## III.

An important issue raised in this case, but not covered by the Circuit Court's declaratory judgment, concerns the "inac-

tive" voters whose signatures were not counted. The Board acknowledges that it invalidated numerous signatures by "inactive" voters, that is, formerly registered voters whose names had been placed on "inactive voter registration" lists. The precise number of these invalidations is not disclosed by the record.

The Board's purported authority for disqualifying the signatures stems from the Election Code and the Board's corresponding regulations in the Code of Maryland Regulations (COMAR). These provisions create *two* voter registries for any particular area: one for active voters and another for "inactive" voters. They further provide that anyone whose name appears on the inactive voter registry will not have his or her signature counted if it appears on a petition. Moreover, Art. 33, § 1–101(gg), states that the term "registered voter" in the Election Code "does not include an individual whose name is on the list of inactive voters." Some of these provisions, and the Board's practices in applying them, are inconsistent with the voter qualifications and the right to vote set forth in Article I of the Maryland Constitution and Articles 7 and 24 of the Maryland Declaration of Rights. Before addressing in detail the Election Code provisions and the Board's practices, we shall first review some of the state constitutional requirements.

## A.

The Maryland Constitution prescribes the *exclusive* and *uniform* qualifications for being on the list of registered voters and being entitled to vote.[7] The right to vote is

---

7. Article I, §§ 1, 2, and 4 of the Maryland Constitution provide:

"**Section 1. Elections to be by ballot; qualifications of voters; election districts.**

"All elections shall be by ballot. Every citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote in the ward or election district in which he resides at all elections to be held in this State. A person once entitled to vote in any election district, shall be entitled to vote there until he

conferred upon any United States citizen, age eighteen or older, who is a Maryland resident, and who is not disqualified by a criminal conviction or mental disability. Article 7 of the Declaration of Rights emphasizes that "every citizen having the qualifications prescribed by the Constitution" has "the right of suffrage." Furthermore, Article I, § 1, mandates that, once entitled to vote in the election district of his or her residence, a qualified voter *remains* entitled to vote in that district until he or she "shall have acquired a residence in another election district. . . ."

 Article I, § 1, of the Constitution and Article 7 of the Declaration of Rights underscore three significant points applicable to the instant case. First, the right to vote is not subject to expiration for voter inactivity or for any other non-constitutional qualification. Second, a qualified voter who moves from one residence to another within the same election

---

shall have acquired a residence in another election district or ward in this State."
**"Section 2. Registration of voters.**
The General Assembly shall provide by law for a uniform Registration of the names of all the voters in this State, who possess the qualifications prescribed in this Article, which Registration shall be conclusive evidence to the Judges of Election of the right of every person, thus registered, to vote at any election thereafter held in this State; but no person shall vote, at any election, Federal or State, hereafter to be held in this State, or at any municipal election in the City of Baltimore, unless his name appears in the list of registered voters; the names of all persons shall be added to the list of qualified voters by the officers of Registration, who have the qualifications prescribed in the first section of this Article, and who are not disqualified under the provisions of [Article I]."
**"Section 4. Right to vote of persons convicted of certain crimes and persons under guardianship.**
"The General Assembly by law may regulate or prohibit the right to vote of a person convicted of infamous or other serious crime or under care or guardianship for mental disability."
Article 7 of the Maryland Declaration of Rights states:
**"Article 7. Elections to be free and frequent; right of suffrage.**
"That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

district remains fully qualified. Third, a qualified voter who may be in the process of moving from one election district into another remains qualified to vote in his or her original district until the change in domicile is fully effective.[8] *See, e.g., Kemp v. Owens,* 76 Md. 235, 242, 24 A. 606, 608 (1892) (Bryan, J. concurring) ("A voter who has resided six months in a legislative district ... and then moves into another legislative district cannot vote in this second district until he has resided therein for the space of six months; but in the meantime he is a legal voter in the district from which he removed"). *See also Oglesby v. Williams,* 372 Md. 360, 812 A.2d 1061 (2002) (the constitutional requirement of residence for political or voting purposes is one of a place of fixed, present domicile, which, once established, is presumed to continue until superseded by a new domicile).

■ Article I, § 2, of the Maryland Constitution requires the General Assembly to provide a system of "uniform Registration" of the names of all qualified voters. Specifically, § 2 imposes three important limitations on the creation and management of the voter registry. First, it commands the General Assembly to create the registry under the specific terms set forth in the section. Second, it requires a *uniform* registration of the names of all the voters possessing the qualifications set forth in § 1 and not disqualified under § 4. Finally, it states that such registration "shall be conclusive evidence" of the registered voter's right to vote. Thus, § 2 contemplates a *single* registry for a particular area, containing the names of *all* qualified voters, leaving the General Assembly no discre-

---

**8.** It is firmly settled that the word "residence" in Article I means "domicile." *See Blount v. Boston,* 351 Md. 360, 365, 718 A.2d 1111, 1114 (1998) (internal quotations omitted) ("From *Thompson v. Warner,* 83 Md. 14, 20, 34 A. 830 (1896), and *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379, 379 (1898), until the present, this Court has consistently held that the words 'reside' or 'resident' in a constitutional provision ... would be construed to mean 'domicile' unless a contrary intent be shown. Thus, our predecessors stated in *Howard v. Skinner, supra,* 87 Md. at 559, 40 A. at 379: 'Residence, as contemplated by the framers of our Constitution, for political or voting purposes, means *a place of fixed present domicile* ' ").

tion to decide who may or may not be listed therein, no discretion to create a second registry for "inactive" voters, and no authority to decree that an "inactive" voter is not a "registered voter" with all the rights of a registered voter. Furthermore, § 2 provides that, once registered, the registration shall be "conclusive" evidence of the right to vote. In other words, the Maryland Constitution does not require anything more from the voter on election day. If the Board later discovers that the voter has voted illegally, § 5 calls for criminal penalties.

██ Disqualification from the right to vote in Maryland is limited to voters who either are convicted of infamous or other serious crimes or who are under care or guardianship for a mental disability. *See, e.g., State v. Bixler,* 62 Md. 354 (1884) (holding that this section refers to such crimes that were "infamous" at common law). Nowhere in Article I does it state or suggest that voting rarely, sporadically, or infrequently, are grounds for being stricken from the uniform registry.

In *State Administrative Board of Election Laws v. Board of Supervisors of Elections of Baltimore City,* 342 Md. 586, 679 A.2d 96 (1996) (hereinafter referred to as *"SABEL "*), this Court declared unequivocally that being a frequent or active voter is not a valid requirement for voting in Maryland. The *SABEL* case dealt with a change in Maryland's Election Code from the repealed Art. 33, § 3–20, which had directed local boards to purge inactive voters annually,[9] to its replacement,

---

**9.** Prior to January 1, 1995, Maryland Code (1957, 1993 Repl.Vol.), Art. 33, § 3–20, directed the local election boards to conduct an annual purge of registered voters who had failed to vote in any primary, general, or special election in the preceding five years. Local boards were also authorized to "establish a mail verification program to verify the correctness and accuracy of the information maintained in the individual voter records of the board." § 3–24(a)(1). Failure to respond to a second notice from the verification program within two weeks resulted in the removal of the voter's name from the board's voter registration files. § 3–24(c)(2)(I). Any citizen removed from the list of eligible voters could re-register up to 45 days prior to an upcoming election. Both §§ 3–20 and 3–24 were repealed, effective January 1, 1995, by Ch. 370 of the Acts of 1995.

§ 3–17A, which limited removal from voter rolls to cases where the voter (a) requested to be removed, or (b) was ineligible under Article I, § 4, of the Maryland Constitution, or (c) had died, or (d) had moved away. *See SABEL,* 342 Md. at 589–591, notes 1–2, 679 A.2d at 97–99 notes 1–2.

Referring to the qualifications listed in Article I, § 1, of the Maryland Constitution, and the limitations listed in Article I, § 4, the *SABEL* opinion stated (342 Md. at 599, 679 A.2d at 102):

> "These prerequisites are the exclusive qualifications for voting in Maryland. *See* Article 7 of the Maryland Declaration of Rights ('every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage'); *Jackson v. Norris,* 173 Md. 579, 594, 195 A. 576, 584 (1937); *Kemp v. Owens,* 76 Md. 235, 24 A. 606 (1892). *See also Board v. Goodsell,* 284 Md. 279, 283, 396 A.2d 1033, 1035 (1978). Moreover, the General Assembly may neither expand nor curtail the qualifications necessary to vote. *See, e.g., Langhammer v. Munter,* 80 Md. 518, 527, 31 A. 300, 301–302 (1895) ('But whatever may be done, no restrictions can be imposed that will require other or different qualifications for voting, than those prescribed by the first Article of the Constitution of the State'); *Southerland v. Norris,* 74 Md. 326, 328, 22 A. 137, 137 (1891) ('These qualifications [for voting in Maryland], fixed by the organic law, can neither be enlarged nor curtailed by the General Assembly')."

Accordingly, we continued, "having voted frequently in the past is not a qualification for voting and, under the Maryland Constitution, could not be a qualification." *SABEL, supra,* 342 Md. at 599, 679 A.2d at 102. The *SABEL* opinion then emphasized that "the sole purpose of former § 3–20, as well as present § 3–17A, was to set forth a procedure or remedy by

---

This Court in *SABEL* stated that "the breadth of [former § 3–20] might well have presented a substantial issue concerning its validity under Article I, § 2, of the Maryland Constitution.... The Attorney General's office, during the oral argument in the present case, expressed the view that former § 3–20 was probably in violation of Article I, § 2." *SABEL,* 342 Md. at 600 n. 9, 679 A.2d at 102 n. 9.

which election boards could remove from the voter registration rolls the names of persons who had died, moved away, or incurred a voting disability under Article I, § 4, of the [Maryland] Constitution." *Ibid.* We further stated that § 3–17A was a more narrowly tailored procedure than the one set forth in former § 3–20. *See* 342 Md. at 599–600, 679 A.2d at 102.

These conclusions were reiterated by this Court the following year, in *Gisriel v. Ocean City Elections Board,* 345 Md. 477, 502–503, 693 A.2d 757, 770 (1997). In that case, a group of citizens filed a petition to bring a zoning ordinance to referendum, but the local election board determined that the petition lacked the requisite number of signatures. In a reversal of roles, it was the persons filing the petition, not the Board, who argued that inactive voters should be stricken from the rolls in order to lower the total number of registered voters, making it easier for their petition to meet the 20% signature requirement. The Court squarely rejected their argument, relying upon our earlier decision in *SABEL, supra,* 342 Md. 586, 679 A.2d 96, and stating that, "[i]n no event should [the inactive voters'] names be removed from the voter registration list." *Gisriel v. Ocean City Elections Board, supra,* 345 Md. at 504, 693 A.2d at 770.

### B.

■ Against this background, however, the Maryland Election Code provides for a separate inactive voter registration list and sanctions removal from that registry for voters whose names have remained on the inactive voter registration list for a specified period of time. As earlier mentioned, Title 1 of the Election Code, in § 1–101(gg), excludes an individual whose name appears on the inactive voter registry from the definition of "registered voter." Section 1–101(gg) is obviously inconsistent with Article I, §§ 1 and 2, of the Maryland Constitution, and Article 7 of the Declaration of Rights, which set forth the qualifications for voters and provide for a single uniform voter registration list which is conclusive evidence of the right to vote. This is significant in the present case because § 6–203(b), addressing validation of petitions, states

that "[t]he signature of an individual shall be validated and counted if . . . [t]he individual is a registered voter in the county specified." Since persons on the "inactive" voter registry are not deemed registered voters, their signatures are not counted.

■ Title 3 of the Election Code, which addresses voter registration generally, states that registration is permanent unless it is cancelled pursuant to the provisions of Title 3. *See* § 3–101(d)(2). Section 3–502 lists the circumstances under which an election official may remove a voter from the registry. Under that section, a voter may be removed only if the voter requests to be removed, is ineligible under the disqualifications enumerated in § 3–102(b),[10] has died, or has moved away.

■ The circumstances set forth in § 3–502 are constitutionally valid bases for removal from the voter registration list. Nonetheless, the Board's practice of creating a separate "inactive voter" registration for voters whom it suspects might have moved out of an election district, and the Board's subsequent removal of such "inactive voters" from that registration list without affirmative proof that the voter has, in fact, moved to a *different* election district, cannot be squared with the constitutional provisions.

As was represented in oral arguments before us, the local boards customarily mail out a sample ballot to registered voters prior to an election. If the sample ballot is returned by the postal service, this prompts the local board to send the voter in question a "confirmation notice" under § 3–504(c). In relevant part, § 3–504(c) states:

"(c) *Change of address outside the county.*—If it appears from information provided by the postal service or an agency specified in § 3–505(b) . . . that a voter has moved to a different address outside the county, the election director

---

**10.** These disqualifications include being convicted of an infamous crime, being under care or guardianship for mental disability, or being convicted of buying or selling votes.

shall send the voter a confirmation notice informing the voter of his or her potential inactive status as described in subsection (f) of this section." [11]

Although the above-quoted statute provides for the sending of a confirmation notice only when the postal service provides information that the voter has moved *outside the county*, at oral argument we were informed that, in practice, a confirmation notice may be sent whenever the sample ballot is returned by the postal service.

■■■ Under § 3–504(f)(1), a voter's failure to respond to the confirmation notice triggers his or her placement on the "inactive voter" registration list. Once placed on the inactive voter registration list, the voter must then submit a written affirmation that he or she in fact remains a resident of the same county in order to be allowed to vote and in order to be restored to the regular voter registration list. *See* § 3–504(f)(2). Without such a written affirmation, if the voter simply fails to vote in the next two elections, the now-inactive voter is removed from the inactive voter registration list. Regardless of such voter's constitutional qualifications under Article I, § 1, he or she is removed from both registration lists. Thus, § 3–504(f)(3) provides:

"(f) *Inactive list.*—

\* \* \*

"(3) An inactive voter who fails to vote in an election in the period ending with the second general election shall be removed from the registry."

This language is reiterated in § 3–504(e)(2), addressing the local election director's discretion to remove a voter from the registry:

---

**11.** Section 3–505 specifies, *inter alia*, which agencies shall report information regarding deaths, name changes, and the convictions for infamous crimes to the various election boards.

"(e) *Removal from registry.*—The election director may not remove a voter from the registry on the grounds of a change of address unless:

(1) The voter confirms in writing that the voter has changed residence to a location outside the county in which the voter is registered; or

(2)(i) The voter has failed to respond to the confirmation notice; and

(ii) The voter has not voted or appeared to vote (and, if necessary, corrected the record of the voter's address) in an election during the period beginning with the date of the notice through the next two general elections."

Nevertheless, under Title 3, subtitle 6 of the Election Code, which deals with the resolution of registration disputes and challenges, a presumption arises that a voter is properly registered unless there is *affirmative proof* to show otherwise. Section 3–602(e)(2) states (emphasis added):

"(e) *Hearing decision.*—* * *

(2) An individual may not be removed from the registry unless the individual's ineligibility is *substantiated by affirmative proof.* In the absence of such proof, the presumption shall be that the individual is properly registered."

This presumption is reiterated in § 3–603(c), which addresses judicial review of a decision rendered in a hearing by a local board. That section provides (emphasis added):

"(c) *Determination of residency.*—In determining whether an individual is or is not a resident of an election district or precinct, the presumption shall be that an individual shown to have acquired a residence in one locality *retains* that residence until it is *affirmatively* shown that the individual has acquired a residence elsewhere."

These presumptions reflect the mandate in Article I, § 1, of the Constitution, that "[a] person once entitled to vote in any election district, shall be entitled to vote there until he shall have acquired a residence in another election district or ward in this State."

There is an obvious conflict between the passive form of "proof" that the local boards rely on, under §§ 3–504(e) and (f), to place individuals on inactive voter registration lists and ultimately to remove them from any voter registration list, and the requirement for affirmative proof of the voter's change in residence set forth in §§ 3–602(e)(2) and 3–603(c).

It is not difficult to think of situations where the present confirmation notice practice to "prove" that voters have moved out of an election district could go awry. Under the current practice, confirmation notices are sent whenever the postal service returns a sample ballot. But the sample ballot might be returned because the voter has moved to another residence in the same election district, or is on vacation, or refuses to accept the mailed material, or for other reasons. Similarly, the confirmation notices may go unanswered for any number of legitimate reasons, including the voter being elsewhere on vacation, mistaking the notice for election-related campaign literature or junk mail and not reading it, or simply forgetting to respond to it. Interestingly, § 3–504(e), discussed *supra*, limits an election director's discretion to remove a voter from the registry on the grounds of a change of address to two alternative scenarios. Under the first scenario, described in § 3–504(e)(1), the director may remove a voter who confirms in writing that he or she has changed his or her residence to a location outside the county in which he or she was originally registered. This would satisfy the requirement for affirmative proof of a change in domicile. The second scenario under § 3–504(e)(2), however, authorizes a voter's removal for inaction which might be caused by numerous factors other than moving to a different election district.

■■■ In addition to the threat of being wholly disenfranchised, an inactive voter will not be counted as part of the registry nor will his or her signature be counted for the purpose of verifying petition signatures. In addition to the previously mentioned effect of § 1–101(gg), §§ 3–504(f)(4) and (5) provide:

"(f) *Inactive list.—*

* * *

"(4) Individuals whose names have been placed on the inactive list may not be counted as part of the registry.

"(5) Registrants placed on the inactive list shall be counted only for purposes of voting and not for official administrative purposes as petition signature verification. . . ."

Therefore, §§ 1–101(gg) and 3–504(f) creates a group of "second-class citizens" comprised of persons who are "inactive" voters and thus not eligible to sign petitions.[12] Not only does this scheme violate Article I of the Maryland Constitution, but it also seems flatly inconsistent with the equal protection component of Article 24 of the Declaration of Rights, which we discuss in some detail in Part IV of this opinion, *infra*. In addition, *see Board v. Goodsell,* 284 Md. 279, 288–293, 396 A.2d 1033, 1038–1040 (1979); *O.C. Taxpayers v. Ocean City,* 280 Md. 585, 594–596, 375 A.2d 541, 547–548 (1977).

In addition, the dual registration system and the treatment of inactive voters are antithetical to the thrust of Article 7 of the Maryland Declaration of Rights, which safeguards "the right of the People to participate in the Legislature," the right of "every citizen having the qualifications" of Article I also having "the right of suffrage," as well as ensuring that "elections . . . be free and frequent." As the Green Party correctly points out, Article 7 has been held to be even more protective of rights of political participation than the provisions of the federal Constitution. *See, e.g., Jackson v. Norris,* 173 Md. 579, 195 A. 576 (1937) (protecting the right to vote for the candidate of one's choice by requiring that there be a space on the ballot in which a voter may write the name of his choice). *See also Munsell v. Hennegan,* 182 Md. 15, 22, 31 A.2d 640, 644 (1943) ("The weight of authority . . . is

---

**12.** It has been reported that the numbers of Maryland voters on the inactive lists are as high as 241,000 voters or 8% of the total voters in Maryland. Inactive voters alone could, in most districts, be numerous enough to meet the 1% nominating petition requirement to place a minor political party's candidate's name on the ballot. *See* Larry Carson, *"Inactives" Don't Figure in State's Voter Count,* BALT. SUN, Nov. 13, 2002, at 1B, reporting inactive voter statistics.

that electors should have the fullest opportunity to vote for candidates of any political party, and while this right, in cases where the public furnishes the ballots, may be restricted by the dictates of common sense, and by considerations of convenience in the size of the ballots, and by considerations of excessive costs, such restrictions will not be upheld when they are destructive of freedom of choice by the voters"). It seems clear that, if the only method left open for the members of a political party to choose their candidates is via petition, then the right to have one's signature counted on a nominating petition is integral to that political party member's right of suffrage. There is no constitutional reason why a once-qualified registered voter, who chooses not to vote frequently, should find his or her right to take part in the nomination process curtailed.

■ Moreover, for the same reasons that we have held unconstitutional §§ 1–101(gg), 3–504(e)(2), 3–504(f)(1), 3–504(f)(3), 3–504(f)(4), and 3–504(f)(5), we also invalidate COMAR 33.05.07.03(D) (2002). Section 6–207(b) of the Election Code authorizes the State Board to promulgate regulations to establish a process for verifying petition signatures. Under regulation .03(B), a voter who is rendered "inactive" by the Board's assumption that the voter moved out of his or her election district may become reinstated for voting purposes by listing the original address next to his or her signature on a nominating petition. *See* COMAR 33.05.07.03(B). Nevertheless, despite the voter's reinstatement into the "active" registry, regulation .03(D) cautions that "[i]n all events, the signature of the inactive voter may not be counted for purposes of the petition itself." COMAR 33.05.07.03(D). Hence, a constitutionally-qualified voter can, by signing a nominating petition, confirm that his or her address never changed, but cannot have his or her signature counted by reason of the Board's mistaken assumption that the address did change. As stated above, eliminating a qualified voter's only option to nominate a candidate is not consistent with state constitutional requirements.

Furthermore, the practice of having a separate registry of inactive voters invites unnecessary confusion and the specter of statistical manipulation. If inactive voters are not counted for petition purposes, then consistency would demand that they cannot be counted among the total number of voters which the percentage signature requirement is based upon. *But cf. Gisriel v. Ocean City Elections Board, supra,* 345 Md. 477, 693 A.2d 757. For instance, if the total number of registered voters in an election district is 11,000, but 1000 of these voters are on the inactive registration list, then a one percent signature requirement would apparently direct a petition-circulator to obtain 100 signatures, or 1% of 10,000. On the other hand, if inactive voters' names are permitted to appear on petitions, then, in the example above, the circulator must collect 110 signatures to meet the requirement of 1% of 11,000. Moreover, since state election officials transmit voter turnout statistics in terms of a percentage of the *active* voter turnout only, this can lead to bizarre outcomes, such as having a voter turnout of more than 100%. *See* Larry Carson, *"Inactives" Don't Figure in State's Voter Count,* BALT. SUN, Nov. 13, 2002, at 1B. This confusion would not arise if the Board maintained one uniform registry, as required by Article I, § 2, of the Maryland Constitution.

In conclusion, we stress that the Maryland Constitution sets forth the *exclusive* qualifications and restrictions on the right to vote in the State of Maryland. The Legislature may not impose additional qualifications or restrictions by requiring voters to cast their votes frequently. Nor may the Board regulate the registry to effect such unconstitutional ends. Additionally, insofar as a minor political party's only option to nominate a candidate is through the process of submitting nomination petitions, a scheme which improperly invalidates a registered voter's signature on a nominating petition unconstitutionally infringes on the right of suffrage guaranteed to all qualified voters by Article I of the Maryland Constitution and Article 7 of the Maryland Declaration of Rights. For the foregoing reasons, we hold that any statutory

provision or administrative regulation which treats "inactive" voters differently from "active" voters is invalid.

## IV.

### A.

The Green Party does not contend that the 1% signature requirement for a candidate nominating petition *alone* is unconstitutional. Rather, the Green Party urges that the *combination* of requirements applicable to minor political parties does not pass constitutional muster. Among other things, the Green Party argues that, by requiring only minor political parties to make a double-showing of support, Maryland's Election Code creates a discriminatory classification in violation of equal protection principles under both the federal and Maryland constitutions. The Green Party asserts that, once a group has submitted the required 10,000 signatures to receive official recognition as a political party, it has demonstrated a "significant modicum of support"[13] and no further showing of support should be necessary for the name of a minor political party's candidate to be on the ballot.

The Board asserts that the Green Party's challenge is "virtually identical" to the challenge brought in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding a 5% signature requirement on a candidate-nominating petition), and that "the Green Party has cited no case disputing the essential holding in that case—that a state may constitutionally require ... [a] minor party candidate to demonstrate a significant modicum of public support, in the form of a nominating petition bearing signatures of 5% of the relevant electorate, before placing the candidate's name on the

---

**13.** This language is from *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554, 562–563 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election").

ballot." (Respondents' brief at 16–17). The Board argues that this case is governed by *Jenness* and that, therefore, the Board is entitled to summary judgment as a matter of law. The Board has not called to our attention any opinion by this Court which supports the result it seeks.

The Circuit Court in the case at bar applied the analysis set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547, 557 (1983), and relied on other United States Supreme Court precedents upholding nominating petition requirements. The requirements in those cases, however, are quite distinguishable from the scheme in the instant case.[14] The Circuit Court in this case reasoned as follows (some internal citations omitted, and parallel citations added):

> "*Anderson* states that there must be some regulation of elections 'if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547, 557 (1983). Likewise, the state has a right to require candidates to make a preliminary showing of substantial support. *See Anderson, supra,* 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9, 75 L.Ed.2d at 557 n. 9. 'It is both wasteful and confusing to encumber the ballot with the names of frivolous candidates.' *Ibid.* The state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory regulations. *See Anderson, supra,* 460 U.S. at 788, 103 S.Ct. at 1570, 75 L.Ed.2d at 557.
>
> "Administrative convenience readily falls under the rubric of a state's 'regulatory interests,' the importance of which

---

**14.** Moreover, we emphasize that "cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provision." *Dua v. Comcast Cable of Md., Inc.,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002). *See also Manikhi v. Mass Transit Admin.,* 360 Md. 333, 362, 758 A.2d 95, 110 (2000); *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 640, 458 A.2d 758, 781 (1983); *Lawrence v. State,* 295 Md. 557, 561, 457 A.2d 1127, 1129 (1983); *Attorney General v. Waldron,* 289 Md. 683, 704–705, 426 A.2d 929, 940–941 (1981).

the Supreme Court has repeatedly recognized. *Wood v. Meadows*, 207 F.3d 708, 715 (4th Cir.2000). The Court has expressly approved a state's interest in limiting the number of candidates on the ballot. *Id.* The state's important interest in showing public support along with limiting confusion has been repeatedly held as legitimate and even compelling. These interests have supported nominating petition requirements similar to or more stringent than Maryland's 1% requirement. *See California Democratic Party v. Jones*, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).

\* \* \*

"Maryland's ballot access requirement of 1% is less stringent than what has already been upheld by the Supreme Court. *See American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (Demanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face). The Supreme Court, in *Jenness v. Fortson*, upheld Georgia's petition requirement of 5%. The Court stated that, while 5% may be somewhat higher than what is required in other states, when coupled with the fact that Georgia has imposed no arbitrary restrictions upon the eligibility of any registered voter to sign a petition, that number is constitutional. *Jenness*, 403 U.S. at 438–439, 442, 91 S.Ct. at 1974, 1976, 29 L.Ed.2d at 560–561, 562. Plaintiffs have not alleged that any other provision of the Maryland election law is unconstitutional except for the 1% petition requirement. Since requirements more stringent than Maryland's requirement have been upheld, as a matter of law, Maryland's 1% requirement is constitutional."

The Board claims that *Jenness* and its progeny are "precisely on point." We disagree. The statutory scheme challenged in *Jenness* is clearly distinguishable from Maryland's requirements for the nomination of minor political party candidates. Under Georgia's election statute, there was no need for a fledgling political group to submit an initial party-forming petition in order to become a recognized "political body." If a

political group had not garnered 20% or more of the vote in the previous state-wide election, it was automatically granted the status of being a recognized "political body" and could choose its candidates by petition. As Justice Stewart explained in *Jenness, supra,* 403 U.S. at 433, 91 S.Ct. at 1971–1972, 29 L.Ed.2d at 557–558 (emphasis supplied and footnotes omitted):

> "The basic structure of the pertinent provisions of the Georgia Election Code is relatively uncomplicated. Any political organization whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election is a 'political party.' *Any other political organization is a 'political body.'* 'Political parties' conduct primary elections, regulated in detail by state law, and only the name of the candidate for each office who wins this primary election is printed on the ballot at the subsequent general election, as his party's nominee for the office in question. *A nominee of a 'political body' ... on the other hand, may have his name printed on the ballot at the general election by filing a nominating petition.* This petition must be signed by 'a number of electors of not less than five per cent. of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking....'"

As pointed out above, the Green Party's challenge involves more than just an objection to the 1% nominating petition requirement alone. The Green Party challenges the *combination* of requirements applicable to minor political parties, maintaining that, even if the State has a legitimate interest in showing public support and limiting confusion on the ballot, these interests are satisfied by submitting the initial party-forming petition signed by 10,000 Maryland voters.

### B.

In our view, the Election Code's two-tiered petitioning requirement for minor parties discriminates against minor political parties in violation of the equal protection component

of Article 24 of the Maryland Declaration of Rights. As earlier discussed, we shall not address the federal constitutional issues debated by the parties.

Article 24 of the Declaration of Rights states as follows:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

In *Frankel v. Board of Regents, supra,* 361 Md. at 313, 761 A.2d at 332, we stated that " '[a]lthough Article 24 does not contain an express equal protection clause, the concept of equal protection nevertheless is embodied in the Article,' " quoting *Renko v. McLean,* 346 Md. 464, 482, 697 A.2d 468, 477 (1997). *See also State Administrative Board of Election Laws v. Board of Supervisors, supra,* 342 Md. at 594 n. 6, 679 A.2d at 100 n. 6; *Gilchrist v. State,* 340 Md. 606, 623 n. 3, 667 A.2d 876, 884 n. 3 (1995); *Ashton v. Brown,* 339 Md. 70, 101 n. 17, 660 A.2d 447, 462 n. 17 (1995); *Maryland Aggregates v. State,* 337 Md. 658, 671–672 n. 8, 655 A.2d 886, 893 n. 8, *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995); *Verzi v. Baltimore County,* 333 Md. 411, 417, 635 A.2d 967, 969–970 (1994); *Lawrence v. State,* 295 Md. 557, 560, 457 A.2d 1127, 1128 (1983); *Attorney General v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 940–941 (1981); *Board of Supervisors of Elections v. Goodsell, supra,* 284 Md. at 293 n. 7, 396 A.2d at 1040 n. 7; *Governor v. Exxon Corp.,* 279 Md. 410, 438 n. 8, 370 A.2d 1102, 1118, n. 8 (1977) *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Bruce v. Dir., Chesapeake Bay Aff.,* 261 Md. 585, 600, 276 A.2d 200, 208 (1971).

Moreover, "the 'federal and state guarantees of equal protection are obviously independent and capable of divergent application.' " *Frankel v. Board of Regents, supra,* 361 Md. at 313, 761 A.2d at 332, quoting *Maryland Aggregates v. State, supra,* 337 Md. at 671–672 n. 8, 655 A.2d at 893 n. 8 (internal citations omitted). *See also Dua v. Comcast Cable of Md., Inc., supra,* 370 Md. at 621, 805 A.2d at 1071 ("[W]e have also

emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart"); *Verzi v. Baltimore County, supra,* 333 Md. at 417, 635 A.2d at 970 ("We have consistently recognized that the federal Equal Protection Clause and the Article 24 guarantee of equal protection of the laws are complementary but independent, and 'a discriminatory classification may be an unconstitutional breach of the equal protection doctrine under the authority of Article 24 alone,'" quoting *Attorney General v. Waldron, supra,* 289 Md. at 715, 426 A.2d at 947); *Kirsch v. Prince George's County,* 331 Md. 89, 97, 626 A.2d 372, 376, *cert. denied,* 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993) ("the two provisions [the Fourteenth Amendment's Equal Protection Clause and Article 24] are independent of one another, and a violation of one is not necessarily a violation of the other").

Under the present statutory scheme, a candidate from one of the two "principal political parties" is deemed to have a significant modicum of support, regardless of the voter turnout at the party's primary election. For instance, if a Democrat runs unopposed in the Democratic Party's primary election, he or she will become the Democratic candidate on the general election ballot even if that candidate receives only one vote at the primary. The Maryland statutes provide that candidate nomination by primary is only available to two political parties: the "political party whose candidate for Governor received the highest number of votes ... at the last preceding general election" and to the "political party whose candidate for Governor received the second highest number of votes ... at the last preceding general election." *See supra* n. 5; § 8–202(a)(1)(i) and §§ 1–101(ee), (w), and (dd). Therefore, the requisite "significant modicum of support" for a principal political party's candidate *is derivative of his or her party's support at the last preceding general election.* This is so even if the principal political party's current candidate is new to the political scene or did not run in the last preceding general

election. The candidate of a "principal party" does not have to show any personal "modicum of support" to be on the general election ballot; the "modicum of support" is the prior support of the party itself.

On the other hand, primary elections are completely closed to minor political parties,[15] and nomination by convention is limited to minor political parties who can establish that 1% of Maryland's registered voters are affiliated with the minor party.[16] Therefore, the only option left for other minor political party candidates to be nominated is by petition signed by not less than 1% of the total number of registered voters who are eligible to vote for the office for which the nomination by petition is sought. *See* § 5–703(e).

The requisite 1% showing of support is *in addition* to the initial showing of support which the minor political party has already demonstrated upon submitting its party-forming petition containing the signatures of 10,000 voters. Unlike the candidate of a principal political party whose "significant modicum of support" is based on his or her party's support at the last preceding gubernatorial election, the minor party's candidate may not derive the required quantum of support from his or her party's support in its party-formation petition. And, unlike the unaffiliated, independent candidate who must only submit *one* petition signed by 1% of the registered voters eligible to vote for the office in question, *see* § 5–701(2)(ii), a minor political party must submit *two* separate petitions before it can run a candidate for office in a general election.

The Board attempts to explain this discrepancy by stating (respondents' brief at 8, 22–23, emphasis added):

"Even though the Green Party submitted more than 10,000 valid signatures of Maryland voters who agreed to support the recognition of the Party, *this does not mean that . . . any particular Green Party candidate will have the support of a significant number of Maryland voters.* Those who

---

**15.** *See* § 8–202 & n. 5 *supra.*

**16.** *See* § 4–102(f) & n. 5 *supra.*

signed the party-forming petition were not required to ...
pledge their support for future party candidates.

* * *

"Surely the State of Maryland need not assume that, merely
because a potential candidate is endorsed by a small, though
recognized, political party, that candidate must necessarily
have 'a significant modicum of support' among Maryland
voters. * * * For these reasons, it is completely reason-
able for the State to require a nominating petition to show
that any particular candidate of a party with which fewer
than 1% of the State's voters are affiliated has a 'significant
modicum of support.' "

It is, however, equally true that an unopposed Democratic or
Republican primary nominee may not necessarily have the
support of a significant number of Maryland voters merely
because his or her party has chosen that particular candidate
to run in his or her party's primary.

As we noted in *Board of Supervisors of Elections v. Good-
sell, supra,* 284 Md. at 286, 396 A.2d at 1036, "[t]he first step
in dealing with a contention that a particular classification
denies to members of one class the equal protection of the
laws is to determine the appropriate standard for reviewing
the classification." In *Hornbeck v. Somerset County Bd. of
Educ.,* 295 Md. 597, 640–641, 458 A.2d 758, 781 (1983), the
Court stated:

"It is well recognized that the constitutional guarantee of
equal protection of the law is afforded to all persons under
like circumstances in the enjoyment of their civil and per-
sonal rights. *Leonardo v. County Comm'r,* 214 Md. 287,
304, 134 A.2d 284 (1957), *cert. denied,* 355 U.S. 906, 78 S.Ct.
332, 2 L.Ed.2d 260; *Tatlebaum v. Pantex Mfg. Corp.,* 204
Md. 360, 369, 104 A.2d 813 (1954). Our cases hold that
where all persons who are in like circumstances are treated
the same under the laws, there is no deprivation of equal
protection, but a law which operates upon some persons or
corporations, and not upon others like situated or circum-

stanced, or in the same class, is invalid. *Waldron, supra,* 289 Md. at 726, 426 A.2d 929; *Wheeler v. State,* 281 Md. 593, 603, 380 A.2d 1052 (1977); *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 60, 300 A.2d 367 (1973).

"We have frequently considered the standard of review to be applied in determining whether the equal protection or equal treatment guarantees of ... Article 24 have been violated by a challenged enactment. *See, e.g., Washabaugh v. Washabaugh,* 285 Md. 393, 404 A.2d 1027 (1979); *Attorney General v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978); *Wheeler v. State, supra; Governor v. Exxon Corp., supra; Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975); *Matter of Trader,* 272 Md. 364, 325 A.2d 398 (1974); *Bureau of Mines v. George's Creek, supra* [272 Md. 143, 321 A.2d 748 (1974) ]. *Attorney General v. Waldron, supra,* affords a concise distillation of the controlling principles. 'Strict scrutiny' is required of a legislative classification when it ... deprives, infringes upon, or interferes with personal rights or interests deemed to be 'fundamental.' 289 Md. at 705–06, 426 A.2d 929. Laws which are subject to this rigorous standard violate the equal protection guarantee unless the State can demonstrate that the statute is necessary to promote a compelling governmental interest. *Id.* at 706, 426 A.2d 929."

And in *O.C. Taxpayers for Equal Rights, Inc. v. Ocean City, supra,* 280 Md. at 594, 375 A.2d at 547, this Court emphasized:

"It is not, however, within the power of a legislative body to make a statutory classification which confers upon one class privileges which are denied to another class, unless the classification, at minimum, has some rational basis. Moreover, we are, of course, here dealing with the right to vote, and thus the classification is subject to some degree of special scrutiny."

*See also Hargrove v. Board of Trustees,* 310 Md. 406, 416–417, 529 A.2d 1372, 1377 (1987); *Broadwater v. State,* 306 Md. 597, 602–603, 510 A.2d 583, 585–586 (1986); *Attorney General v. Waldron, supra,* 289 Md. at 705–706, 426 A.2d at 941; *Board*

*of Supervisors of Elections v. Goodsell, supra,* 284 Md. at 286, 396 A.2d at 1037.

This Court's decision in *Board of Supervisors of Elections v. Goodsell, supra,* is particularly helpful in our analysis. That case dealt with a candidate, Vincent F. Goodsell, who desired to run for the office of County Executive of Prince George's County. The Board of Elections for Prince George's County refused to place his name on the ballot, claiming that the County Charter required a County Executive candidate to have been a 'qualified' voter of Prince George's County for at least five years immediately preceding his election and that Goodsell had not met this requirement. Although Goodsell had resided within the county for more than five years prior to filing for office, he had been registered to vote there for just over two years. He argued that if the County Charter required that a candidate be a *registered* voter for the five years immediately preceding the election, then such requirement would violate equal protection principles by discriminating against residents of Prince George's County who had not been registered to vote for five years. The Board argued, *inter alia,* that the pursuit of public office is not a fundamental right, that, therefore, the rational basis test should apply, and that there was a rational basis for the classification.

Quoting from *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 99–100 (1972), the *Goodsell* Court acknowledged (284 Md. at 287, 396 A.2d at 1037, internal quotations and citations omitted):

" '[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review.... Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of

such barriers does not of itself compel close scrutiny .... *In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'*

"The [*Bullock*] Court then stated that ... many potential office seekers would as a practical matter be precluded from running for office, that the effect on voters is neither incidental nor remote, and that the voters are substantially limited in their choice of candidates. Because of this impact upon voter choice, the Court concluded that the Texas filing requirements were subject to the same 'close scrutiny' test which is applicable to laws placing barriers upon the right to vote."

*See also Hargrove v. Board of Trustees, supra,* 310 Md. at 426, 529 A.2d at 1382 ("[T]he constitutional right to be a candidate for elective office is a corollary of the constitutional protection of the elective franchise").

As we noted in *Goodsell, supra,* 284 Md. at 288, 396 A.2d at 1037–1038, " 'the extent and nature of the impact on voters, examined in a realistic light, is the key to the' appropriate standard for judicial review," quoting *Henderson v. Fort Worth Independent Sch. Dist.,* 526 F.2d 286, 291 (5th Cir. 1976). It seems clear that, not unlike the exorbitant filing fees in *Bullock v. Carter,* or the five year registration requirement in *Goodsell,* the double petitioning requirement set forth by the Maryland Election Code denies ballot access to a significant number of minor political party candidates. On that basis, the challenged statutory provisions' impact on voters is substantial. Consequently, the provisions challenged in the instant case must withstand a higher degree of scrutiny than the so-called "rational basis test." It is incumbent upon the Board to show that the two-tiered petitioning requirement imposed upon minor political parties is " 'reasonably necessary to the accomplishment of legitimate' governmental objectives, ... or 'necessary to promote a *compelling* governmental interest.' " *Goodsell, supra,* 284 Md. at 289, 396 A.2d at 1039.

The Board argues that it has "articulated legitimate State interests to justify Maryland's 1% nominating petition requirement. * * * [T]he primary interest served by Maryland's nominating petition requirement is to show public support for the nominee." (Respondents' brief at 29–30). The Board also advances "the State's interest in limiting the number of candidates on the ballot so as to avoid confusion and avoiding a ballot overloaded with the names of 'frivolous' candidates having virtually no support among the voters." (*Id.* at 30).

These interests, however, are satisfied by the initial party-forming petition requiring 10,000 signatures alone. In this case, the Board required the Green Party to submit an initial petition listing the signatures of 10,000 Maryland voters, followed by a second petition containing *less signatures,* namely 3,411, representing 1% of the registered voters in the first congressional district. If many of the 10,000 initial petition signers were from the first congressional district, nothing prevents the same voters from signing the second petition. It is difficult to comprehend how the second petitioning requirement adds very much more, in the way of showing public support, to the first petitioning requirement.

Furthermore, an unaffiliated, independent candidate need only submit one petition bearing the signatures of 1% of the registered voters in the district for the office sought, and that single petitioning requirement is deemed to show a sufficient modicum of support. The additional burden of two petitioning requirements for a minor party candidate, and the requirement that a greater modicum of support be shown, is not justifiable.

The 10,000 signature petitioning requirement initially imposed upon minor political parties sufficiently prevents the ballot from being overloaded with "frivolous" candidates. "Regardless, in a democracy, the appropriate judges of which candidates are frivolous, and which candidates have the greater commitment . . . are the voters on election day." *Goodsell, supra,* 284 Md. at 290, 396 A.2d at 1039.

For the reasons stated above, we hold that the second petitioning requirement applicable to minor political parties' candidates discriminates against those parties and candidates in violation of the equal protection component of Article 24 of the Maryland Declaration of Rights.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED, AND CASE REMANDED TO THAT COURT FOR THE ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENTS.*

Concurring Opinion by HARRELL, Judge in which RAKER and WILNER, JJ., join.

I concur in the judgment because I agree with the Majority's holding in Part III that Article 33 §§ 1–101(gg)[1] and 6–203(b)(2) of the Maryland Election Code, which differentiate between "inactive" voters and "active" voters, are invalid. I disagree, however, with Part IV of the opinion, where the Majority concludes that the State's double petition requirement for minor political parties and their candidates violates the equal protection component of Article 24 of the Maryland Declaration of Rights. Requiring a *political organization* to petition statewide to achieve status as a minor political party and then requiring a *candidate of that minor political party* to petition to obtain at least the signatures of 1% of the registered voters in the geographical district from which he or she intends to run for office in order to appear on the ballot is constitutional.

When the State's classification is asserted to infringe on a fundamental right or interest, the Court should analyze the matter according to a "strict scrutiny" standard. *Attorney General v. Waldron,* 289 Md. 683, 705–06, 426 A.2d 929, 941–42 (1981). In order for a statute or regulation to withstand equal protection scrutiny under the strict scrutiny standard,

---

**1.** The current version of this is found at Maryland Code (2003), Election Law, § 1–101(mm).

the State must show that the law is "necessary to promote a compelling governmental interest." *Waldron,* 289 Md. at 706, 426 A.2d at 941 (*quoting Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615). If a fundamental right is not at issue, then the standard of review is the "rational basis" test, a notably less strict standard. As the Majority points out, when a court is dealing with political candidate restrictions, it must examine the extent and nature of the impact on the voters to determine the appropriate standard of review. Majority op. 377 Md. at 162–63, 832 A.2d at 235. Although it is debatable whether the Majority is correct in concluding that the petition requirement has a substantial impact on voters, under either test Maryland's double petition requirement should be found constitutional.

Because the equal protection guarantees found in the federal constitution and Maryland's Declaration of Rights are considered "in pari materia," federal case law which interprets the federal equal protection clause is instructive here. *See Waldron,* 289 Md. at 714, 426 A.2d at 946. Although the Majority is correct in noting that Article 24 and the federal Equal Protection Clause are independent provisions which are capable of differing interpretations (Majority, op. 377 Md. at 158, 832 A.2d at 232), in actual application this Court has interpreted Article 24 to apply "in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution." *Waldron,* 289 Md. at 704, 426 A.2d at 941 (*quoting United States Mortgage Co. v. Matthews,* 167 Md. 383, 395, 173 A. 903, 909 (1934)). In fact, in *Bureau of Mines v. George's Creek,* this Court explained that it is well established that "the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities" for this purpose. 272 Md. 143, 156, 321 A.2d 748, 755 (1973).

In its analysis, the Majority does not seem to dispute the fact that the State has a legitimate interest in regulating the quantity and quality of the candidates who appear on its ballots. Majority op. 377 Md. at 144–45, 832 A.2d 224. This is in line with the reasoning of the Supreme Court, which has held repeatedly that states have a compelling interest in

preventing ballots from being overrun with candidates, the effects of which include voter confusion and frivolous candidacies. *See Lubin v. Panish,* 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702, 708 (1974) (describing the State's interest in managing its ballot as one of the highest order). To this end, the Supreme Court has declared that a state is permitted to require candidates to demonstrate "a significant modicum of support" before being placed on the ballot. *See Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554, 562; *see also American Party v. White,* 415 U.S. 767, 783, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744, 761 (1974).

Just as the Majority does not dispute a state's right to require a showing of a "significant modicum of support" in order to gain ballot access, it also does not contest that the 1% of registered voters signature requirement in a given geographical district for a nomination petition is itself unconstitutional. Instead, what the Majority rejects is the combination of the petition requirements because it feels that the double petition requirement subjects minor political party candidates to two showings of support, where the same is not true of independent candidates or candidates of the two current and long standing major political parties. Majority op. 377 Md. at 164–65, 832 A.2d at 236.

The Majority's analysis of the State's election laws and the purpose behind each petition requirement, however, is incomplete. The first petition requirement, which is a *state-wide* petition for a political group to gain recognition as a political party, is *not* designed to demonstrate a "significant modicum of support" for a minor political party candidate in the district from which he or she may wish to run for office. Voters who sign the party-recognition petition neither are pledging their loyalty to the party nor promising to support a particular candidate in a future election. Rather, these signators simply are indicating their view that the named party should be recognized as a political party in the State of Maryland. Maryland Code (2003), Election Law Article, § 4–102. Once the potential candidate's party is recognized as a political party statewide, the potential candidate must

petition to get the signatures of 1% of the voters from the political subdivision he or she wishes to represent. It is this latter requirement, in contrast to the former, that demonstrates the "significant modicum of support" that the Majority seems to acknowledge is a compelling state interest.

In *Mathers v. Morris,* the U.S. District Court for the District of Maryland considered a challenge to Maryland's election laws similar to that mounted here. 515 F.Supp. 931 (1981). There the plaintiffs were challenging the constitutionality of Maryland's two-part design for determining political party status, which included a political organization filing petitions signed by 10,000 voters in order to achieve recognition as a political party followed by attaining at least three percent of the vote in a Presidential or Gubernatorial election in order to maintain its status as a political party. *Mathers,* 515 F.Supp. at 937. In rejecting the plaintiffs' challenge, the court explained that, given that the 10,000 statewide signature requirement for recognition as a political party is a relatively low threshold requirement, the more burdensome requirement of polling a 3% popular vote to maintain party status is not on its face unconstitutional. *Id.* Moreover, the court stressed that the State's interest in requiring a significant modicum of support "does not disappear once an organization has complied with some initial threshold requirement." *Mathers,* 515 F.Supp. at 938. This is analogous to the argument that the Green Party mounts in the present case. The 10,000 signature statewide petition, which measures a political entity's popular support to be recognized as a political party, does not impinge on Maryland's independent, legitimate interest in having that party's candidates demonstrate a "significant modicum of support" in a specific district before being allowed to appear on the ballot.

Like Maryland, Pennsylvania also conditions ballot access for minor political party candidates on a modest showing of popular support. Although the election laws of the respective states differ somewhat, there are sufficient similarities between the two systems to make persuasive here case law analyzing the constitutionality of Pennsylvania's election laws

with respect to minor political parties recognition requirements persuasive here. As explained in *The Patriot Party v. Mitchell*, in Pennsylvania, if a political body's candidates received at least 2% of the largest vote cast in the most recent general election, then it is recognized as a political party in the Commonwealth. 826 F.Supp. 926, 929 (E.D.Pa.1993), *aff'd*, 9 F.3d 1540 (3d Cir.1993). Pennsylvania law then classifies a political party as "major" if its membership consists of at least 15% of registered voters in the State and as minor if its registration is less than 15% of registered voters statewide. *Id.* While major political parties use the primary to determine who will represent them on the ballot, minor political parties must use nomination petitions to gain access to the general election ballot. *Id.* For a nonstatewide elective office, a minor political party candidate must garner the signatures of at least 2% "of the largest entire vote case for any officer ... elected at the last preceding election in said electoral district for which said nomination papers are to be filed." 25 Pa. Stat. Ann. § 2911(b) (2002).

In *The Patriot Party* case, the Patriot Party of Pennsylvania, an offshoot of Pennsylvanians for Ross Perot, was certified as a minor political party, but Surrick, a candidate for the party, was unable to appear on the ballot because he failed to obtain the requisite number of signatures on his petition. 826 F.Supp. at 930. Like the petitioners in the case before this Court, the plaintiffs in *The Patriot Party* argued that the state's election laws were unconstitutional because it was unfair to require minor political party candidates continually to meet the signature requirement to gain access to the ballot because they already demonstrated the "significant modicum of support" when Pennsylvania recognized their political organization as a minor political party. *The Patriot Party*, 826 F.Supp. at 934.

Finding their rationale unpersuasive, the Pennsylvania federal court soundly rejected the plaintiffs' argument, holding that is not unconstitutional to require minor political party candidates to undergo a petition requirement in order to appear on the ballot. *The Patriot Party*, 826 F.Supp. at 935.

The court upheld the constitutionality of Pennsylvania's election scheme, in part because the U.S. Supreme Court has recognized that there are differences between historically established political parties and small, newly-founded political parties and that it is not inappropriate for a state to recognize these differences.[2] *Id.* (*cited in Jenness,* 403 U.S. at 441–42, 91 S.Ct. at 1976, 29 L.Ed.2d at 562). While Ross Perot received over 902, 000 votes in Pennsylvania in the 1992 Presidential election, the Patriot Party was unsuccessful in its efforts to solicit members. *The Patriot Party,* 826 F.Supp., at 935. Because the Patriot Party "has not historically demonstrated broad support in Pennsylvania," the court reasoned that the Commonwealth constitutionally can require minor political parties to use the nomination process, which would demonstrate such support, so that Pennsylvania may achieve its interest of managing the number of candidates on the ballot. *Id.*

Like the Patriot Party, the Green Party also lacks established support on the record of this case. While the Green Party was able to garner the 10,000 signatures statewide to be recognized as a political party, according to the record there are only 229 voters statewide who have registered as Green Party members or otherwise expressed a desire to be associated with the group. Employing the rationale of *The Patriot Party* case, the lack of established support for the Green Party serves to justify Maryland's double petition requirement. It is the second petition requirement, and not the party-recognition petition, which ensures that a minor political party candidate actually has a significant modicum of support in the geographical district from which he or she wishes to run.

---

**2.** This decision also helps to explain why Maryland allows candidates representing the major political parties to use the primary process to access the ballot instead of using nomination petitions. The historically established broad support of the major political party ensures the State that its ballots will not be overrun with frivolous candidates, an insurance that is lacking with minor political party candidates.

For the aforementioned reasons, I respectfully disagree with the Court's conclusion that the State's double petition requirement violates Article 24 of the Declaration of Rights.

## ON MOTION FOR RECONSIDERATION

ELDRIDGE, Judge.

Pursuant to Maryland Rule 8–605, the defendant Maryland Board of Elections has filed a motion for reconsideration, asserting that this Court's opinion "prevents the State Board of Elections ... from following the mandates of federal law in a federal election" and "places [the Board] in the position of having to violate two federal statutes, the Supremacy Clause of the United States Constitution, and Article 2 of the Maryland Declaration of Rights." (Motion for Reconsideration at 1.) Specifically, the Board asks this Court to review Part III of the opinion holding that certain statutory provisions and administrative regulations which treat "inactive" voters differently from "active" voters, and which provide for a separate inactive voter registration list, are invalid under the Maryland Constitution. The Board argues that the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg *et seq.,* and the Help America Vote Act of 2002, 42 U.S.C. § 15301 *et seq.,* "compel[ ] states to establish a process for removing the names of certain ineligible voters from voter registration lists used in federal elections" and that "[a]t least for federal elections, [the] ... voter registration list must contain an 'inactive' category...." (Motion for Reconsideration at 2.) Correctly noting that this Court's decision prohibits the creation of a separate inactive voter registry, the Board claims that "federal law ... compels creation of such a category." (*Ibid.*) In sum, the Board states, "there is no way that Maryland election officials can comply with both federal law and this Court's decision." (*Id.* at 3.)

For the reasons outlined below, we disagree with the arguments advanced by the Board.

## I.

The National Voter Registration Act of 1993 ("NVRA") was enacted, *inter alia,* "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," as well as "to ensure that accurate and current voter registration rolls are maintained." 42 U.S.C. §§ 1973gg(b)(1) and (b)(4). Under § 1973gg–6(a)(4), a State is required to implement a program which removes from the official voter registry the names of voters who have died or have changed their residence. In pertinent part, § 1973gg–6(a)(4) states:

"(a) **In general.** "In the administration of voter registration for elections for Federal office, each State shall -

\* \* \*

"(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of-

(A) the death of the registrant; or

(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) [of this section]."

Section 1973gg–6(b) requires that the program implemented to remove voters under subsection (a)(4) must be a nondiscriminatory program and that the program "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote." Subsection (b) provides, in relevant part:

"(b) **Confirmation of voter registration.** Any State program ... ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office-

"(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C.1973 *et seq.*); and

"(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual-

(A) has not either notified the applicable registrar ... or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B) has not voted ... in 2 or more consecutive general elections for Federal office."

Section 1973gg–6(c)(1) sets forth an example of a program for the removal of ineligible voters from the registry. We stress that a State is not required to implement the program described in (c)(1); the statute merely provides an illustrative example, which, so long as it does not offend the State's Constitution and election laws, *may* be used by a State in complying with the requirements of subsection (a)(4). Subsection (c)(1) provides in relevant part as follows (emphasis added):

"(c) **Voter removal programs.** (1) A State *may* meet the requirement of subsection (a)(4) by establishing a program under which—

(A) change-of-address information supplied by the Postal Service ... is used to identify registrants whose addresses may have changed; and

(B) if it appears from information provided by the Postal Service that—

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change ... by

which the registrant may verify ... the address information; or

(ii) the registrant has moved to a[n] ... address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.[3]

Finally, § 1973gg–6(d) addresses the removal of names from the official registry. Subsection (d)(1) sets forth a prohibition with two exceptions. The statute prohibits the States from removing the name of a registrant on the grounds of a change of residence unless one of two situations exists: First, where the registrant confirms in writing that he or she has moved out of the registrar's jurisdiction. Second, where the registrant fails to respond to a specific type of notice sent by the registrar in conformity with paragraph (d)(2) and the registrant has not voted in the previous two general elections following the transmission of the notice to the registrant. Subsection (d)(1) provides (emphasis added):

"**(d) Removal of names from voting rolls.** (1) A State. *shall not remove* the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

**(A)** confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

**(B)** (i) has failed to respond to *a notice described in paragraph (2);* and

---

**3.** The term "registrar's jurisdiction" is defined in § 1973gg–6(j), in pertinent part, as follows:

"(1) an incorporated city, town, borough, or other form of municipality;

"(2) if voter registration is maintained by ... [another] unit of government that governs a larger geographic area than a municipality, the geographic area governed by that unit of government; or

"(3) if voter registration is maintained on a consolidated basis for more than one municipality or other unit of government by an office that performs all of the functions of a voting registrar, the geographic area of the consolidated ... units."

(ii) has not voted ... in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice."

Paragraph (2) prescribes the detailed requirements of the notice which the Board must send to a registrant before the Board may remove the registrant's name from the official list. The notice must (1) be a postage prepaid and pre-addressed card, (2) be sent by forwardable mail, (3) provide the registrant with the opportunity to state his or her current address, (4) notify the registrant of the date when he or she must return the card, and (5) state the consequences of not returning the card timely. In relevant part, § 1973gg–6(d)(2) provides:

"(2) A notice is ... a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A) If the registrant did not change ... residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote ... during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction ..., information concerning how the registrant can continue to be eligible to vote."

Finally, § 1973gg–6(d)(3) requires a registrar to correct the official list to reflect the change of address information which the registrar receives from a voter responding to the confir-

mation notice sent pursuant to (d)(2). A corresponding provision appeared in § 3–504(d) of the Maryland election laws, which we did not invalidate in our opinion in this case. Subsection (d)(3) simply provides:

"(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection."

Before addressing the specific federal statutory provisions which the Board relies upon, we emphasize that Part III of our opinion conforms with the fundamental thrust of the federal statutes. For instance, in our opinion we held that Article I, § 2, of the Maryland Constitution contemplates one uniform registry as opposed to two separate registries, one for "active" voters and another for "inactive" voters. Nothing in the above-cited federal statutes suggests that a state *must* create a separate inactive voter registry. Indeed, § 15483(a)(1)(A) of the Help America Vote Act provides that "each State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State . . . ." Moreover, § 15483(a)(1)(A)(viii) states that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."

Our opinion repeatedly underscored that being a frequent or active voter was not an eligibility requirement under Article I of the Maryland Constitution. The federal statutes cited by the Board are entirely consistent with this. As the Board concedes, § 1973gg–6(b)(2) of the National Voter Registration Act directs that a State's program "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote . . . ." Even more emphatic is the mandate contained in § 15483(a)(2)(B)(ii) of the Help America Vote Act, which requires that "[t]he list maintenance performed . . . shall be conducted in a manner

that ensures that \* \* \* only voters who are not registered or who are not eligible to vote are removed from the computerized list." Additionally, § 15483(a)(4)(B) provides that "[t]he State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including \* \* \* [s]afeguards to ensue that eligible voters are not removed in error from the official list of eligible voters."

Finally, our opinion made clear that the second-class status conferred upon "inactive" voters, and the corresponding inferior set of rights affixed to that status insofar as petitions are concerned, violates the Maryland Constitution. Once again, we find nothing in the federal statutes relied upon by the Board which supports the notion that an election board may refuse to count signatures on a petition because the persons signing were "inactive" voters.

■■■ As to the federal statutory provisions relied upon by the Board, we believe that subsections (b), (c), and (d) of § 1973gg–6 of the National Voter Registration Act should be construed in harmony with the general intent of the Act, which, *inter alia,* is to establish procedures that will *increase* the number of registered voters and ensure that accurate and current voter registration rolls are maintained. *See* §§ 1973gg(b)(1) and (b)(4). Subsection (b) of § 1973gg–6 is consistent with our opinion. That provision requires a uniform and non-discriminatory program to maintain accurate and current voter registration records and rejects a program that results in the removal of a registrant's name from the official list by reason of the registrant's failure to vote.

Likewise, subsection (c) does not mandate any procedure that is inconsistent with our opinion. On the contrary, that provision suggests a permissive sample program—a guideline. It explicitly provides that a State *may* meet the federal statute's requirement in § 1973gg–6(a)(4) by establishing a program under which change-of-address information supplied by the Post Office is used to identify registrants whose addresses may have changed. It neither requires the states

to implement the specific program illustrated, nor does it state that the guideline described therein is the exclusive method to be used by the states in order to maintain accurate and current registration rolls.

Moreover subsection (d) does not appear to be a *mandate* which is irreconcilable with our opinion in this case. To begin with, (d)(1) prohibits the states from removing the name of a registrant from the official list of eligible voters on the ground that the registrant has changed residence, except in the event of two alternative situations. The remainder of subsection (d) sets forth exceptions to this prohibition. An exception to a prohibition is not normally construed to be an affirmative mandate. Consonant with our opinion, § 1973gg–6(d)(1)(A) allows a state to remove from the official list the names of registrants who affirmatively confirm that they have moved out of their original district. Similarly, § 1973gg–6(d)(1)(B) allows a state to remove the name of a registrant who fails to respond to the registrar's confirmation notice and has not voted for a prescribed period of time. Consistent with the well-settled principle that a statute should be construed so that all of its parts harmonize with each other and are consistent with the statute's general intent,[4] we read subsections (c) and (d) together as suggesting a particular program for meeting the requirement of § 1973gg–6(a)(4) that ineligible voters be removed from the registration list. Subsection (c)(1) clearly states that a state "may" adopt the program described in subsection (c)(1)(A) and (B), and (B)(ii) then

---

4. *See, e.g., Dimensions Health Corp. v. Md. Ins. Admin.,* 374 Md. 1, 17, 821 A.2d 40, 50 (2003); *State v. Crescent Cities Jaycees Found., Inc.,* 330 Md. 460, 468, 624 A.2d 955, 959 (1993); *Gruver–Cooley Jade Corp. v. Perlis,* 252 Md. 684, 692, 251 A.2d 589, 594 (1969); *Clerk of Circuit Court v. Chesapeake Beach Park, Inc.,* 251 Md. 657, 664, 248 A.2d 479, 483 (1968); *State Dep't of Assessments & Taxation v. Ellicott–Brandt, Inc.,* 237 Md. 328, 335, 206 A.2d 131, 135 (1965); *Associated Acceptance Corp. v. Bailey,* 226 Md. 550, 556, 174 A.2d 440, 443 (1961); *Maguire v. State,* 192 Md. 615, 623, 65 A.2d 299, 302 (1949) (" 'A statute should be so construed that all its parts harmonize with each other and render them consistent with its general object and scope," ' quoting *Pittman v. Housing Authority of Baltimore City,* 180 Md. 457, 463–464, 25 A.2d 466, 469 (1942)).

refers to the notice procedure "described in subsection (d)(2) to confirm the change of address." Thus, the procedure in (d)(2) seems to be part of the program which a state "may," but is not required to, adopt.

As our opinion in this case held, under Article I of the Maryland Constitution, the boards of elections may not maintain separate registries of "inactive" voters based on "passive proof" that a voter may no longer be eligible to vote in the district in question. Our opinion stated that "the Board's practice of creating a separate 'inactive voter' registr[y] for voters whom it suspects might have moved out of an election district, and the Board's subsequent removal of such 'inactive voters' from that registration list without affirmative proof that the voter has, in fact, moved to a different election district, cannot be squared with the constitutional provisions [set forth in Article I of the Maryland Constitution]." In its motion, the State Board of Elections asserts that "[w]hether maintaining a separate list of these [inactive] voters violates the requirement that there be a single official list of eligible voters would seem to be a semantic, rather than a meaningful, argument." (Motion for Reconsideration at 9 n.8). We disagree. Under § 3–504(5) of the Maryland Election Code, "[r]egistrants placed on the inactive list shall be counted only for purposes of voting and not for such official administrative purposes including petition signature verification, establishing precincts, and reporting official statistics." In the case at bar, the Board's practice of striking the names of "inactive" voters from the Green Party's nominating petitions presented a very meaningful problem for Mr. Gross; he was kept off the ballot.

The provisions of the Help America Vote Act cited by the Board do not appear to help its position. As the Board points out, § 15483(a) of the Help America Vote Act provides for the implementation and maintenance of statewide computerized voter registration lists. Subsection (a)(2) provides:

"(2) Computerized list maintenance. (A) In general. The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows:

(i) If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 . . . ."

Insofar as removal from the voter registry is concerned, the Act merely seems to embody the National Voter Registration Act's requirements. Likewise, § 15483(a)(4) of the Help America Vote Act provides that "[t]he State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including . . . [a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." Section 15483(a)(4)(A) explicitly requires that such a system be "consistent with the National Voter Registration Act of 1993."

Additionally, in its motion, the Board asserts (Motion for Reconsideration at 8) (emphasis added):

"[I]f a specimen ballot or other election mailing to the old address is returned by the post office with a forwarding address, election officials determine whether the new address is inside or outside the county and inside or outside Maryland. If the new address is in-county, the registrant's record is updated and a confirmation notice is mailed. *Whether or not election officials receive a response, the voter's name remains on county rolls.* If the new address is in another Maryland county, the registrant's voter registration record is updated and transferred to the new county and a confirmation notice is mailed. *Whether or not election officials receive a response, the voter's name remains on the voter registry in the new county.* On the other hand, if the new address is outside Maryland, election officials place the voter's name on the [inactive] list and send a confirmation notice . . . ."

But a plain reading of § 3–504(f) of the Maryland Election Code indicates that, "[i]f a voter fails to respond to a confirmation notice sent based on information that the voter moved to a different residence outside the local board's jurisdiction, the

voter's name shall be placed on a list of inactive voters." The Maryland Election Code does not differentiate between the voters whose new address is in-county as opposed to those whose new address is in a new county or outside of Maryland. It simply relegates *all* voters who do not reply to the confirmation notice to the inactive list and, *inter alia,* strips them of their ability to be counted as petition-signers.

The Maryland Constitution, as interpreted in our opinion does not countenance a program in which a voter is labeled "inactive," and eventually removed from the registry, without affirmative proof that the voter has been rendered ineligible to vote in the district in question by his or her change in residence to another district. Our opinion rejects a program which authorizes removal from the registration rolls by reason of a voter's inaction which, as we pointed out, "might be caused by numerous factors other than moving to a different election district." Section 3–504(e)(1) allows an election official to remove a voter who confirms in writing that he or she has changed his or her residence to a location outside the county in which he or she was originally registered. We held that this satisfies the requirement for affirmative proof of a change in domicile. The option presented in § 3–504(e)(2), which allows an election official to remove a voter who does not respond to the confirmation notice and fails to vote in the prescribed period, does not satisfy the requirement for affirmative proof of a voter's change in domicile.

## II.

The State Board of Elections asserts that "the holdings in Part III of the Court's opinion . . . appear to make it impossible for election officials to comply with the mandates in the [National Voter Registration Act and Help America Vote Act]." (Motion for Reconsideration at 3.) The Board further states that "there is no way that Maryland election officials can comply with both federal law and this Court's decision." (*Ibid.*). As discussed above, however, there appears to be no *mandatory* procedure in the National Voter Registration Act or the Help America Vote Act that is inconsistent with our

opinion. On the contrary, many of the provisions of the federal statutes cited by the Board dovetail with Part III of our opinion. Indeed, the Board seems to concede in its motion that placing voters who do not respond to confirmation notices on an inactive list is not required by the federal statutes and that "should this Court find [that practice] inconsistent with the State Constitution, Maryland election officials could stop the practice without violating clear mandates of federal law." (Motion for Reconsideration at 12 n.10). There would seem to be many ways to establish a program that complies with the requirements in the federal statutes and with the Maryland Constitution.

Nevertheless, we have remanded this case for further proceedings, and specifically a new declaratory judgment to be crafted and filed by the Circuit Court. In the interests of justice, upon remand to the Circuit Court, and prior to the entry of a new declaratory judgment, the State Board of Elections should be given the opportunity to demonstrate, if it can, any circumstances where there is an irreconcilable conflict between Maryland Constitutional requirements and *mandates* of federal law. If, in the judgment of the Circuit Court, the Board makes such a showing, obviously, under the Supremacy Clause of the United States Constitution, the federal statutes should prevail and the new declaratory judgment should so reflect.

*MOTION FOR RECONSIDERATION GRANTED TO THE EXTENT INDICATED ABOVE, AND OTHERWISE DENIED.*